**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MURRAY PRODUCTS, INC., Respondent.**

**No. 77–1909.**

United States Court of Appeals, Ninth Circuit.

Oct. 27, 1978.

**936**

Michael Messitee, Atty. (argued), Washington, D. C., for petitioner.

J. Nicholas Counter, III (argued), Mitchell, Silberberg & Knupp, Los Angeles, Cal., for respondent.

Before CHOY and ANDERSON, Circuit Judges, and PALMIERI,* District Judge.

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. 29 U.S.C. §§ 158(a)(1), (3) (1970). The statute reads in relevant part:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 &ast; &ast; &ast; &ast; &ast; &ast;

PALMIERI, District Judge:

This is an application by the National Labor Relations Board (the Board) for enforcement of its order finding Murray Products, Inc. (the Company) guilty of unfair labor practices under sections 8(a)(1) and (3) of the National Labor Relations Act (the Act).[1] In its decision and order, reported at 228 N.L.R.B. 268 (1977), the Board found that the Company had discriminatorily refused to reinstate nine striking employees when they unconditionally applied for reinstatement. In partial reversal of the Administrative Law Judge, a divided Board also found that the Company's offers of reinstatement made within the two weeks following the strikers' application were invalid. The Board ordered backpay from the date of the employees' reinstatement application until the date when valid offers of reinstatement were made, a period of some two months.

Murray Products, Inc., located in Orange, California, manufactures plastic laminated countertops and bars and is an employer engaged in commerce. Norman Murray is president of the Company; his sons Kenneth and William are secretary-treasurer and vice-president, respectively. In March, 1975, a majority of the Company's employees chose the Orange County District Council of Carpenters (the Union), affiliated with the United Brotherhood of Carpenters and Joiners, AFL–CIO, as their exclusive collective bargaining representative, and the Union was so certified by the Board. Negotiations for an initial contract reached an impasse on July 16, and on July 17, a strike was called.

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

 . . . .

Section 157, § 7 of the Act, among other things establishes the right of employees "to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Two new employees, Francis and Taylor,[2] had been hired just before the strike but did not begin work until July 18. Between the beginning of the strike and August 4, the Company hired eight more persons: D. Foust, Koerner, DeVito, and Harms on July 21–22, Sanford on July 29, R. Foust on July 31, and Wyatt and Elliott on August 1. Before Taylor and Francis started work, they were told that there was a labor dispute in progress and that their employment was therefore temporary, and a statement to that effect was placed on their job applications[3] and signed by them. Substantially the same statement was made to D. Foust, DeVito, Koerner, and Wyatt, both orally and on their job applications, and was acknowledged by their signatures. Harms was told, however, that he was being hired for a "new position." The job applications of Sanford and R. Foust did not contain the "temporary" notation. Nevertheless, Kenneth Murray, who had hired them, testified that he had been advised that he "had an obligation to put it on there" and that its omission was an "oversight," and furthermore that he had orally informed all employees hired during the strike that a labor dispute was in progress.

On the morning of August 4, 1975, eighteen days after the strike began, eleven strikers came to the Company's plant. Their picket captain, R. Bennett, told Kenneth Murray that the picket signs were down and that they wanted their jobs back.

Murray answered, however, that their jobs had been filled and that there were no openings at that time. A striker asked if this meant that they had been terminated, and Murray said, "No. . . . Things are slow." The strikers then left the plant.

Later that day, Kenneth and Norman Murray met with R. Bennett and two officers of the Union. One of the officers, Osburn, asked for an employee seniority list. Norman Murray said, "Yes, and I assume this is for the purpose of bringing the strikers back to work as openings occur." It is disputed whether Osburn agreed with this statement. Such a list was subsequently prepared and supplied to the Union.

On August 6, the strike and picketing resumed. The Company, which had just received a rush order from a customer, began on August 6 to offer reinstatement to the strikers in order of their seniority.[4] R. and D. Bennett, Dillon, Mileham, F. and J. Moreno, and Chavez were approached individually on the picket line by Kenneth Murray between August 6 and August 12 and were offered their jobs back. Only one, Dillon (not a discriminatee herein), accepted and was immediately returned to work. At least three of this group were told that the Company had "an opening." In all instances, Murray carried a seniority list in his hand, and as each striker rejected the offer—usually because he was unwilling to cross the picket line—Murray drew a line through his name in his presence. In the

---

**2.** Because of the number of employees involved in this case, a list of their names may be helpful. Those marked by an asterisk are the nine alleged discriminatees herein.

 *Strikers* (in order of seniority)
Rollins
R. Bennett *
Cooksley
Dillon
D. Bennett *
Mileham *
Schmitz *
Walters
F. Moreno *
J. Moreno *
Corcoran *
Garcia *
Chavez *
*Alleged replacements*
Francis

Taylor
D. Foust
Koerner
DeVito
Harms
R. Foust
Sanford
Wyatt
Elliott

**3.** DeVito's job application contained this signed statement, which was substantially similar to those on the other applications: "Hired on Temporary Basis and understanding Labor Dispute in process."

**4.** The striker with the highest seniority, Rollins, had a broken arm, and Kenneth Murray told him that he would be eligible for reinstatement when he obtained a medical release.

case of Chavez, a Union official who was at the scene asked whether a "no" response to the offer would mean that Chavez was terminated, and Murray answered, "No, your [Chavez'] name would just be taken off the list." By contrast, however, at least two strikers, D. Bennett and Mileham, were told that the offer did represent their "last chance" and was the Company's "final offer," and that if they did not take it "now," they would be terminated permanently.

Two strikers were telephoned at home with offers of reinstatement. Kenneth Murray telephoned Schmitz at 7:00 or 8:00 A.M. on August 8 and asked him to be at the plant by 10:00 A.M. Schmitz agreed, though it is disputed whether he agreed to return to work or only to talk with Murray at that time about doing so. In any case, when Schmitz arrived, he found the picket line still up and refused to cross it. Murray thereupon crossed his name off the seniority list. On August 11, Kenneth Murray telephoned Corcoran at home to offer him immediate reinstatement, but Corcoran refused unless all the strikers were reinstated together.

The last striker involved in this case, Garcia, proved unreachable by telephone on August 11 and 12, and Kenneth Murray eventually was told that he had taken another job. Nevertheless, the following telegram was sent to Garcia on August 12: "This is your last chance to report to work on or before 7 A.M. Aug. 14 pursuant to your unconditional offer to return to work of Aug. 4." Garcia did not respond to the telegram.

During the month of August, two strikers who had not been in the group that came to the plant on August 4 requested reinstatement, one on August 9 and the other during the week of August 18. Both were immediately returned to their old jobs, and neither is alleged to be a discriminatee herein.

Finally, on October 8, 1975, seven strikers —R. and D. Bennett, F. and J. Moreno, Mileham, Schmitz, and Corcoran—again came to the plant to request reinstatement. Although William Murray said that there were no openings at that time, he took their names and all were reinstated shortly thereafter, five to their prestrike jobs and two to different jobs within the plant. Garcia was offered reinstatement but declined, and Chavez had been an employee for the summer only and so did not return in October.

## Discussion

Two issues are presented by this case: (1) Did the Company discriminatorily refuse to reinstate the strikers when they first requested reinstatement? (2) If so, were the Company's offers of reinstatement during the following week valid, tolling its backpay obligation which accrued at the time of the refusal?

### I.

### The Refusal to Reinstate

 Employees who are not working because of a labor dispute continue to be "employees" of their employer unless they have obtained regular and substantially equivalent work elsewhere. National Labor Relations Act § 2(3), as amended, 29 U.S.C. § 152(3) (1970); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). When the labor dispute is economic in nature, however, the employer is entitled to hire permanent replacements for strikers for the legitimate business purpose of continuing operations. *Mackay, supra*, 304 U.S. at 345–46, 58 S.Ct. 904; *see Plastilite Corp.*, 153 N.L.R.B. 180 (1965), *modified on other grounds and enforced*, 375 F.2d 343 (8th Cir. 1967). Economic strikers who have been permanently replaced are entitled to reinstatement only as vacancies occur thereafter in the employer's work force; the employer is not obliged to discharge the permanent replacements in order to make room for them. *Mackay, supra*, 304 U.S. at 345–46, 58 S.Ct. 904; *General Teamsters Local 162 v. NLRB*, 568 F.2d 665, 668 (9th Cir. 1978); *H. & F. Binch Co. v. NLRB*, 456 F.2d 357, 363 (2d Cir. 1972); *Snow v. NLRB*, 308 F.2d 687, 694 (9th

Cir. 1962); *Laidlaw Corp.,* 171 N.L.R.B. 1366, 1369–70 (1968), *enforced,* 414 F.2d 99 (7th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). If the strikers have not been permanently replaced, however, the burden of proof to that effect resting with the employer, *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34–35, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), they are entitled to immediate reinstatement upon their unconditional application to return to work. *NLRB v. International Van Lines,* 409 U.S. 48, 50, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); *Mackay, supra,* 304 U.S. at 345–46, 58 S.Ct. 904. Without such proof, a refusal to reinstate employees after a strike constitutes an unfair labor practice despite the absence of bad faith or anti-union animus, since such a refusal "discourage[s] employees from exercising their rights to organize and to strike guaranteed by §§ 7 and 13 of the Act (. . . 29 U.S.C. §§ 157 and 163)." *Fleetwood, supra,* 389 U.S. at 378, 88 S.Ct. at 546.

█ The Company first argues that its refusal to reinstate the strikers on August 4 did not violate sections 8(a)(1) and (3) because by that date they had all been permanently replaced. Whether each new employee was a permanent replacement or not is a question of fact, on which the Board's finding is conclusive "if supported by substantial evidence on the record considered as a whole." National Labor Relations Act § 10(e), as amended, 29 U.S.C. § 160(e) (1970); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Electro Vector, Inc.,* 539 F.2d 35, 37 (9th Cir. 1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977). The Board adopted the finding of the Administrative Law Judge that, of the ten new employees, only Elliott was a permanent replacement for a striker.[5] Since Harms was hired for a "new position," the Administrative Law Judge reasoned, he could not have replaced a striker. Francis and Taylor could not have replaced strikers because they were hired before the strike began. In addition, they and four other new employees had been notified orally of their temporary status and had acknowledged it in writing. The foregoing constituted sufficiently substantial evidence to support the Board's conclusion that the eight employees in question—Francis, Taylor, D. and R. Foust, Koerner, DeVito, Sanford, and Wyatt—were temporary, and that finding will not be disturbed.

The Company argues, however, that even if the new employees were not hired as permanent replacements for strikers, they became such on July 23, when the Company formed the belief that there was no longer a possibility of reaching a settlement with the Union and so decided to treat all the new employees as permanent. Nothing in the record, however, indicates that the Company communicated its subjective belief or its decision to the Union, the strikers, or the new employees. Under these circumstances, a unilateral, undisclosed decision by the Company is inadequate to define or alter the status of the new employees. Moreover, it is significant that as late as August 1, the "temporary" notation was placed on Wyatt's job application and signed.

█ It is thus evident that all the strikers but one were entitled to immediate reinstatement at the time of their unconditional application on August 4.[6] The Administrative Law Judge and the Board correctly concluded that Elliott had replaced Chavez, the striker with the least seniority, *see Fire Alert Co.,* 223 N.L.R.B. 129, 130 (1976), *enforced,* 566 F.2d 696 (10th Cir. 1977), so the Company's refusal to reinstate Chavez on August 4 was not an unfair labor practice. On August 6, however, the Company determined that it had "an opening." The Board therefore found August 6 to be the date of

---

**5.** Elliott had been hired specifically as a "permanent" employee pursuant to an agreement with the rehabilitation agency which had referred him to the Company.

**6.** The Company properly should have discharged the temporary replacements in order to reemploy the strikers. *See Collins Mining Co.,* 177 N.L.R.B. 221, 241 (1969), *enforced,* 440 F.2d 1069 (6th Cir. 1971).

a discriminatory refusal, by omission, to reinstate Chavez as well.

The Company contends, however, that its refusal to reinstate the strikers on August 4 was not an unfair labor practice because its offers of reinstatement during the following week were made pursuant to an agreement with the Union, formed later in the day on August 4, when the Company furnished the Union with a seniority roster. This agreement purportedly consisted of two conversations between Norman Murray and Union officials, and one communication, referring to the agreement, which Murray sent to the Union but to which he received no answer.[7] If such an agreement had been validly made only a few hours after the Company had refused to reinstate the strikers, the Company's backpay liability would have been tolled almost immediately and rendered *de minimis.* It is not settled whether a labor union has authority to make an agreement on behalf of the members of its bargaining unit waiving or abridging their right to reinstatement. *See Fleetwood, supra,* 389 U.S. at 381 n.8, 88 S.Ct. 543 (reserving the question); *Lodges 743 and 1746, IAM v. United Aircraft Corp.,* 534 F.2d 422, 451 (2d Cir. 1975) (same), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87, *modifying* 192 N.L.R.B. 382 (1971). We need not reach the question here, however, for the Board, without expressly finding to that effect, treated the situation as though no such agreement existed, and the evidence is adequate to sustain such an inference.

The Administrative Law Judge and the Board correctly found the Company guilty of an unfair labor practice in refusing to reinstate eight strikers on August 4 and Chavez on August 6.

## II.

### *The Subsequent Offers of Reinstatement*

The Company's discriminatory refusal to reinstate the strikers on August 4, 1975, gave rise to a backpay obligation running from the date of the refusal to reinstate each discriminatee until his reinstatement or a valid offer to reinstate him. *See Eagle International, Inc.,* 223 N.L.R.B. 29, 29 (1976). The Company contends, however, that its backpay obligation was tolled on August 6–12, when offers of reinstatement made to each discriminatee were rejected, rather than in October of that year, when most of the strikers returned to work. This aspect of the case is somewhat more troublesome, but we have concluded that the Board's finding that these offers were invalid was supported by substantial evidence on the record considered as a whole and should be sustained.

■ An important element to be considered in determining the validity of an offer of reinstatement is whether it affords the offeree a reasonable period of time to consider it. Essentially, however, the validity of the offer depends on the situation in which the offeree finds himself as a result of the discrimination against him. *See Fredeman's Calcasieu Locks Shipyard, Inc.,* 208 N.L.R.B. 839 (1974). The Board in a number of cases has found offers of reinstatement invalid because they required an answer within an unreasonably short time under the circumstances. *See, e. g., Penco Enterprises, Inc.,* 216 N.L.R.B. 734, 734–35 (1975) ("one day at the most"); *Southern Household Products Co.,* 203 N.L.R.B. 881, 882–83 (1973) (four days); *Leprino Cheese Co.,* 170 N.L.R.B. 601, 607–08 (1968), *enforced,* 424 F.2d 184 (10th Cir.), *cert. denied,* 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970) (same day); *Portage Plastics Co.,* 163 N.L.R.B. 753, 753 (thirty minutes). A period of three working days, however, when fixed as part of a strike settlement agreement between the union and the company, has been approved *sub silentio* by the Board. *See Brooks Research & Manufacturing, Inc.,* 202 N.L.R.B. 634, 636 (1973).

■ In the present case, the Administrative Law Judge concluded that eight of the

---

7. The Company's factual allegations in support of the existence of the agreement are disputed by the Union, both as to the content of the conversations and as to receipt of the written communication.

nine offers were valid under the circumstances. The remaining discriminatee, D. Bennett, declined work because of blistered hands, and the Administrative Law Judge found no reason to accord him backpay. The majority of the Board, however, disagreed with these findings and found that the discriminatees had not been given a reasonable opportunity to consider the offers and, further, that the offers had not been made in good faith. The two dissenting members would have upheld the Administrative Law Judge on the issues of reasonable time to consider the offers and the good faith of the Company.

The Company argues (1) that its offers of reinstatement did not contemplate an immediate yes or no response, (2) that even if an immediate answer was required, this requirement nonetheless gave the strikers a reasonable opportunity to consider the offers under the circumstances, and (3) that the offers were made in good faith. The Company relies primarily upon the absence in the record of any testimony by the discriminatees that immediate replies had been explicitly demanded. Both the Administrative Law Judge and the Board, however, found it clear from the circumstances that immediate answers were expected, and the dissenting Board members did not disagree. All but three of the discriminatees were approached personally on the picket line by Kenneth Murray, who made the offer and stood waiting for an answer, seniority list and pen in hand, ready to cross off the list those who refused. One of the remaining strikers, Schmitz, was telephoned at home and given two to three hours, at most, to consider the offer; Corcoran was telephoned at home for an immediate response, and Garcia was sent a telegram giving him something less than two days to report to work.

The Administrative Law Judge and the dissenting members of the Board found that even though the offers required an immediate response, they were valid because

> immediate tasks were awaiting each person approached with an offer of rein-

statement; each offer, except for Donald Bennett's, was conveniently susceptible to acceptance; no striker requested extra time to consider the offer or to adjust personal affairs or indicated in any way that he was not being given an adequate opportunity to evaluate the offer. Indeed, . . . in deciding not to return to work, these discriminatees were influenced by apparent tactical or common policy front considerations causing most to choose continued picketing rather than abandonment of the strike. Thus, no time limitation imposed by Respondent for acceptance of any offer appears accountable for the discriminatees' rejection of employment in August.

228 N.L.R.B. at 270 (footnotes omitted). Additionally, the dissenters considered that the Company had made the offers in good faith, motivated by a genuine desire to reemploy the strikers.

The majority of the Board, however, considered significant two factors not discussed by the Administrative Law Judge: (1) the Company's previous discriminatory refusal to reinstate the striking employees on August 4 and the effect of such action on them, and (2) its "classic lack of candor" in telling the strikers at that time that they had all been permanently replaced and later that it only had "an" opening, when it actually had ten positions not filled with permanent replacements. Under these circumstances, the majority concluded, the discriminatees needed "a reasonable time for serious evaluation of the offers of reinstatement," *id.* at 269, which was not afforded them.

The taking of time to consider the offers was neither invited by the employer nor solicited by the employees. It is possible to construe the facts to signify that neither side desired more time. However, we agree that the complete lack of any time for their consideration must invalidate the offers, since no unusual circumstances are apparent here requiring immediate replies. This court's decision in *NLRB v. Harrah's Club*, 403 F.2d 865 (9th Cir. 1968), does not re-

quire a contrary conclusion.[8] On the facts before us, and in light of all the circumstances, the strikers' rejections and their failure to request additional time for consideration could not retroactively validate offers which were deficient when made.[9] The Board could justifiably construe the words "last chance," "final offer," and "now," used in making several offers, as indicating that any request for additional time to consider them would have been declined. Nor is it material that immediate tasks in the plant awaited each offeree and that no apparent physical disability prevented most of the strikers from abandoning their picket signs and resuming work.

 Although the majority of the Board found that the offers had been made in bad faith, such a finding was unnecessary and not germane to the issue of their validity. Sections 8(a)(1) and (3) of the Act make it an unfair labor practice for an employer, regardless of intent, to act toward his employees in a manner which interferes with, restrains, or coerces them in their exercise of their section 7 rights—in this instance, self-organization and concerted activity.[10] *Fleetwood, supra,* 389 U.S. at 380, 88 S.Ct. 543. The proper standard for identifying a violation of these sections, therefore, must focus primarily upon the likely effect on the employees of the employer's actions, rather than the latter's subjective intent. Here, the Board was justified in construing the effect of the Company's words and actions on the discriminatees as compelling a belief that (1) they had to respond to the offers immediately and (2) if they declined, they

might lose their jobs permanently or possibly lose seniority or reinstatement rights. Such a belief tended to restrain them in the exercise of their section 7 right to engage in concerted action. The Board's finding that the offers were not valid was supported by substantial evidence, and it follows that each discriminatee was entitled to backpay[11] until such time as a valid offer was made to him.

Enforcement of the Board's order is granted.

8. In *Harrah's Club,* the employer offered reinstatement to two persons who had been discriminatorily laid off some months earlier. Each offer included four days' reporting time, but one offeree demanded four weeks to consider it, and the other flatly refused because the offer did not mention unconditional reinstatement or backpay. This court, reversing the Board, agreed with the Trial Examiner "that, in the circumstances, as evidenced by the record, . . . the offers of permanent employment to [the two discriminatees] were bona fide and valid and were rejected." 403 F.2d at 871. In that case, however, the rejected offers not only included a relatively substantial period of time for their consideration but were not made in the emotionally charged atmosphere of an on-

going strike and in the face of prior contradictory statements by the employer. In the case before us, by contrast, most of the discriminatees were not explicitly afforded any time to consider the offers, and in no case did an offeree have more than one to two days.

9. *Contra, NLRB v. Betts Baking Co.,* 428 F.2d 156, 158 (10th Cir. 1970).

10. See note 1 *supra.*

11. *See Eagle International, Inc., supra,* 223 N.L. R.B. at 29. In the case of Chavez, the Company's backpay liability began on August 6, *see* pages 939–40, *ante.*