**ZAPEX CORPORATION and BDM Services Company, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2948.

United States Court of Appeals, Ninth Circuit.

May 1, 1980.

Rehearing Denied July 1, 1980.

SNEED, Circuit Judge:

On both jurisdictional and substantive grounds the petitioners-appellants object to an order of the National Labor Relations Board that would require them to make amends for a temporary failure to reinstate former economic strikers and to refrain in the future from similar unfair labor practices. The General Counsel of the Board cross-applies for enforcement of the order. This court has jurisdiction under sections 10(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 160(e), (f) (1976). Petitioners-appellants contend that because of their relationship to the United States Army they are not subject to the Act and that the Board's reinstatement order was not supported by substantial evidence. We find no merit in the appellants' contentions and grant enforcement of the order.

## I.

### FACTUAL BACKGROUND

For years BDM Services Company (BDMSC), a wholly owned subsidiary of BDM Corporation (BDM), has provided scientific and technical support to the Combat Development Experimentation Command (CDEC) of the United States Army at Fort Ord and Fort Hunter Liggett near Monterey, California. Until July 1975, Bell Aerospace Corporation (Bell) performed all maintenance work for the CDEC programs. Through competitive bidding, however, BDMSC supplanted Bell, receiving a one-year contract for maintenance work to be performed after July 1, 1975. Zapex Corporation, a wholly owned subsidiary of BDMSC, was formed to serve as a subcontractor for this work. BDM, BDMSC, and Zapex (the companies) must be regarded as a single entity for purposes of this case.

During July 1975, while Zapex was gradually taking over Bell's duties, thirty-four employees of Zapex and BDMSC went on strike. The strike was apparently led by the International Brotherhood of Electrical

Mark S. Ross, San Francisco Cal., argued, Allen W. Teagle, Littler, Mendelson, Fastiff, San Francisco, Cal., on brief, for petitioners.

Andrew Tranovich, NLRB, Washington, D. C., argued, Elliott Moore, Washington, D. C., on brief, for respondent.

Before TRASK and SNEED, Circuit Judges, and GRAY,* District Judge.

* Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

Workers, Local 2182, which had represented Bell employees and now sought designation as the collective bargaining representative for a large number of BDMSC and Zapex employees.[1] Within a week BDM had transferred several employees from other offices to replace the strikers. Later Zapex began to recruit and interview job applicants with qualifications comparable to those of the strikers. A number of new employees were hired.

The strike ended on August 29, 1975. Between August 28 and September 4 fourteen strikers offered unconditionally to return to work, and on September 3 the union made such an offer on behalf of all the strikers. Over a period of six months Zapex made fourteen offers of reinstatement: six between October 9 and November 28, seven between February 4 and 23, 1976, and the last on April 5, 1976. Between July 31, 1975 and January 7, 1976 the union and William C. Rudd, one of the strikers, filed unfair labor practice charges alleging among other things that Zapex had unlawfully refused the strikers prompt reinstatement.

After a hearing an administrative law judge decided that the companies constitute an "employer" within the Board's jurisdiction, and the full Board agreed. *BDM Services Co.*, 218 N.L.R.B. 1191 (1975). On the merits of the charges another administrative law judge found that the companies had committed unfair labor practices only in refusing immediate reinstatement to strikers Rudd and David Spears. *Zapex Corp.*, 235 N.L.R.B. 1237, 1263 (1978) (administrative law judge's decision). A three-member panel of the Board affirmed in part and reversed in part, finding that twelve other strikers should have been reinstated immediately after offering to return to work. *Id.* at 1237.

The companies have maintained all along that their relationship with the Army in performing the CDEC contracts ousts the Board of its jurisdiction. Alternatively, the companies argue before this court that the Board erred in its partial reversal of the administrative law judge's decision on the merits and that the Board's order should not be enforced. The facts pertaining to these objections are as follows:

A. *As To Jurisdiction.*

To decide the issue of the Board's jurisdiction, we must examine the contract between the appellants and the Army. We observe first that it declared that BDMSC was to be an independent contractor and not an agent of the Army. It specifically acknowledged the contractor's freedom to enter into collective bargaining agreements, as the previous contractor Bell had done. BDMSC was required only to notify the Army of labor disputes that would or might threaten to delay the contractor's performance, giving appropriate details. Consistent with this provision, on July 24, about two weeks into the strike, the Army's contracting officer sent BDMSC a "cure notice" enumerating respects in which performance was lacking and setting a ten day deadline for the correction of the deficiencies. The company responded that the strike had caused the deficiencies, that it would try to hire replacements for the strikers, and that it would submit a plan and schedule for remedying the deficiencies. The Army apparently did not concern itself further with the labor dispute or threaten the company with penalties.

The contract gave the Army considerable flexibility in deciding how much to demand of the contractor. It provided for cost reimbursement and the award of an addition-

---

1. BDM Services Co., 218 N.L.R.B. 1191, 1193 (1975), which contains the Board's decision that it had jurisdiction over the companies, also ordered an election for the bargaining unit consisting of:

   All senior engineers, senior associate engineers, engineers, associate engineers, senior scientific programmers, scientific programmers, systems programmers, programmers,

   programmers analysts, and associate programmers employed by the employer in its engineering department in and around Fort Ord, California, including Hunter Liggett Military Reservation, including group leaders, but excluding office clerical employees, guards, all other employees, and supervisors as defined in the Act.

al fee within a fixed range, based on the Army's evaluation of the work done. It estimated a minimum number of man hours needed for the contractor's performance and fixed the Army's maximum liability in dollars. This maximum could be revised upward but a standard Army procurement clause made revision cumbersome. Nevertheless, when the Army added experiments beyond the number initially proposed, BDMSC requested higher maximum funding and permission to increase staffing. This was granted in July 1976.

The appellants stress the degree of control over their employees reserved to the Army under the contract. The Army regulated employee cost expenditures by a system of "work directives," "task assignments," and "work orders," which limited the companies' allocation of workers to specific tasks. In addition, the Army retained the right to request and veto compensated overtime. Regulations incorporated in the contract set minimum wage rates and required a certain level of employee fringe benefits. On the other hand, the contract permitted a twenty percent variance between the work force estimated in the BDMSC bid and actual staff levels. The companies assigned employees to specific tasks and had some discretion to increase or decrease the allotment of staff to particular projects. The need for overtime was also their determination, and although the contract required the Army's prior written approval for paid overtime, the appellants often did not receive approval until overtime work had begun.

Significant Army control of employees is reflected by the contract's provisions about work rules, hiring, promotion, and discharge. The contractor was required to adopt a "counterpart mode" of organization mirroring the Army's. That is, each Army position had its image in the assignment of one of the contractor's employees as a co-worker. If the Army altered the structure of the CDEC, the contractor would have to follow suit. While working in the field, the contractor's employees were required to wear army uniforms and share Army mess facilities. Laboratory employees slept in Army quarters. The employees, however, did not have PX privileges and could use the Army's medical facilities only on an emergency basis. Company supervisors, however, directed and evaluated the employees' work.

Moreover, the companies recruited their own employees. Company representatives conducted interviews, screened resumes, and informed applicants of acceptance or rejection, working conditions and starting dates. The Army had the contractual prerogative of rejecting applicants and of examining employees' credentials. Although it did interview employees from time to time for this purpose, the Army's oversight appears to have been no more demanding than that of a general contractor concerning the competence of a subcontractor's crew. Company supervisors recommended and gave raises and promotions, based in part on their own evaluations. Despite the required dress code, the Army could remove the contractor's employees from job sites only for serious breaches of security or for endangering life or limb. While the Army could request the discharge of an employee on certain grounds, the contractor made the final decision, and indeed denied those few requests of this sort that were made.

### B. *As To Reinstatements.*

As has been mentioned, the administrative law judge found that only two strikers were wrongly denied reinstatement. With respect to each of the remaining twelve considered by the Board to be eligible for reinstatement, the administrative law judge, in reaching the conclusion that each had been replaced by a permanent employee, examined the company's employee roster for the relevant period and found that no worker similarly qualified, receiving wages as high as the strikers', was employed on a temporary basis at the relevant time. The Board's disagreement with the lower decision rests in part on other evidence in the record. As indicated earlier, the company initially transferred some employees from other offices to replace the strikers. The Army's contracting officer

testified that Dr. Daniel McDonald, the appellants' chief executive officer, informed him that the replacements were temporary and that the strikers would eventually be reinstated. The appellants' letter in response to the Army's cure notice said again that the contractor was using interim replacements. Another company officer, Richard Cline, testified that temporary replacements remained at Zapex as late as September. There was no evidence that these temporary employees had been confirmed in permanent positions or replaced by new permanent employees. Indeed, the companies ran newspaper advertisements during the period after the strikers had offered to return to work, seeking applicants for employment in jobs equivalent to those held by the strikers. Mr. Hofer, also a company officer, testified that these recruiting efforts were in preparation for an anticipated contract with the United States Department of State that would require operations in the Sinai peninsula; he also said, however, that the advertising was billed to the Army as a cost of the CDEC contract. Moreover, the advertisements did not mention the Sinai, but referred instead to "immediate openings" and "immediate requirements" with Zapex in south Monterey County where Fort Ord and Fort Hunter Liggett are situated.

The appellants did not maintain a fixed number of employees to perform the same jobs on a daily basis but instead shifted available qualified employees from task to task as they were needed, an arrangement referred to as the "matrix system." They stress that as of August 20, 1975 the number of employees working in the CDEC exceeded a pre-contract staffing projection. In the course of the hearing on the unfair labor practice charges, the General Counsel subpoenaed the personnel records of all employees at work on the CDEC contract during the strike and subsequent absence of the strikers. Though the appellants failed to comply fully, the administrative law judge was apparently satisfied that they had done all that was reasonably convenient. In their briefs and in argument the appellants excused their omission as compelled by the difficulty of retrieving the documents from scattered corporate offices.

## II.

### JURISDICTION

■ Section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2) (1976), provides that the United States is not to be treated as an employer. It is conceded that except for the work done for the Army by the companies, they were the employer of the strikers and within the Board's jurisdiction. The case law applying section 2(2), however, indicates that an employer who is otherwise subject to the labor laws may share the governmental exemption in certain circumstances. The appellants rely on this case law. They assert they share the United States' exemption with respect to employees on CDEC projects and advance several theories, which they consider distinct, in support of that result: (1) that the Army exercises substantial control over collective bargaining matters; (2) that the companies' operations are intimately bound up with the Army's function, and (3) that they and the Army are joint employers.

*NLRB v. E. C. Atkins & Co.*, 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947), is the only applicable Supreme Court precedent. It treated the question of shared exemption as depending entirely on whether the private employer retained enough control over terms and conditions of employment that the employees could fairly be described as the employer's rather than the government's. *Id.* at 412–13, 67 S.Ct. at 1272–1273. The Court indicated that in these matters the Board's determination deserves much attention: it "must be accepted by reviewing courts if it has a reasonable basis in the evidence and is not inconsistent with the law." *Id.* at 403, 67 S.Ct. at 1268 (citation omitted). The Board has sometimes declined jurisdiction in cases that raised a shared exemption issue, stating that the "intimate relationship" between the employers made application of the labor laws to the nonexempt employer inappropriate. *See, e. g., Roesch Lines, Inc.*, 224 N.L.R.B.

203, 204 (1976); *Toledo District Nurse Association*, 216 N.L.R.B. 743 (1975). Whether this inappropriateness rests on a finding of a joint employer situation or on a discretionary abstention by the Board because of the intimate relationship is not entirely clear. In any event, several circuits have held that the decision of the Board in "intimate relationship" cases regarding its jurisdiction is within its discretion and should not be overturned "in the absence of extraordinary circumstances." *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898, 904 (5th Cir. 1978); *Compton v. National Maritime Union*, 533 F.2d 1270, 1275–76 (1st Cir. 1976); *Herbert Harvey, Inc. v. NLRB*, 424 F.2d 770, 780 (D.C.Cir.1969).

■ We hold that under no theory do the companies share the United States' exemption. The record supports the Board's conclusion. The companies retain substantial control over such bargaining subjects as wages, hours, and other conditions of employment. The negotiation of a collective bargaining agreement is not precluded. Dress requirements, sharing of facilities, and adoption of the "counterpart mode" are relevant evidence of the Army's control of labor relations. *See, e. g., Toledo District Nurse Association, supra.* However, explicit contractual provisions, confirmed by the parties' conduct, clearly do preserve the companies' substantial independence in these respects. In addition, there are no significant limitations on the companies in such common areas of collective bargaining as seniority, grievance procedures, retirement plans, profit sharing, and health insurance. *See Pope Maintenance Corp., supra*, 573 F.2d at 903. Although the Army wields some influence over wages, promotion, and discharge, it is not sufficient to require that the Board be denied jurisdiction. Nor is this conclusion altered by the cost-plus-fee-award formula. Although the formula may restrict the companies' ability to raise wages, it by no means eliminates all room for negotiation.

Nor are the appellants joint employers with the Army. Two Board opinions do appear to resolve shared exemption issues in terms of joint employer status without reference to the "substantial control" test of *E. C. Atkins & Co. Toledo District Nurse Association, supra*; *Massachusetts Society for Prevention of Cruelty to Animals*, 203 N.L.R.B. 98, 99 (1973).[2] We read these cases as applying the "substantial control" test implicitly. So construed, neither supports the companies' joint employers arguments: the Army did not exercise substantial control over the appellants' labor relations. The appellants' "intimate relationship" argument fails for the same reasons.

Finally, to the extent the appellant is arguing that the Board in the exercise of its discretion should have abstained from exercising its jurisdiction we need only say that no "extraordinary circumstances" exist in this case.

### III.

### REINSTATEMENT

■ An employer must reinstate an economic striker who offers unconditionally to return to work, unless the employer has a substantial and legitimate business reason for refusing to do so. *NLRB v. International Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972); *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–911, 82 L.Ed. 1381 (1939). But during a strike the employer has the right to hire replacements, and continued employment of a permanent replacement is an adequate reason for refusing to reinstate the striker whose position has been filled. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543,

---

2. The appellants cite *ARA Services, Inc.*, 221 N.L.R.B. 64 (1975), as well. It speaks, however, of joint employer status as entailed by an exempt entity's substantial control over the private employer's labor relations. *Id.* at 65–66. Three other Board decisions cited by the appellants did not present shared exemption issues but used the phrase "joint employers" or cognate terms in deciding whether ostensibly separate nonexempt employers were jointly liable for labor law violations. The controlling factors in these cases have no obvious bearing on shared exemption problems, nor do the appellants explain why they should be considered.

546, 19 L.Ed.2d 614 (1967). Whether the employer has permanently replaced a striker is a factual question, and the Board's finding in that regard is reviewable under the "substantial evidence" standard of section 10(e), 29 U.S.C. § 160(e) (1976). *NLRB v. Murray Products, Inc.*, 584 F.2d 934, 939 (9th Cir. 1978).

■ Although the administrative law judge found that all but two of the strikers had been permanently replaced when the offers to return to work were made, the Board disagreed. It held that twelve others should have been promptly reinstated. In support of its conclusion, the Board found that the administrative law judge

(1) erred in not placing upon [the companies] their burden of proving that the strikers had been permanently replaced; (2) ignored, or gave insufficient weight to, admissions in the record that [the companies] utilized temporary replacements for the strikers; (3) improperly failed to draw an adverse inference from [the companies'] failure to produce subpoenaed records regarding striker replacements; and (4) analyzed incorrectly and gave insufficient weight to evidence that [the companies] advertised immediate job openings in positions for which former strikers were qualified.

*Zapex Corp., supra*, 235 N.L.R.B. at 1240.

Without commenting on the relative strength of these points, we find that in the aggregate they provide the "substantial evidence" needed to support the order. *See Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977). Before this court, and apparently before the Board, *Zapex Corp., supra*, 235 N.L.R.B. at 1239 n.9, the companies argued that the "matrix system" of employee assignments frustrated their efforts to come forward with a list of permanent replacements for the strikers. They did not offer, and in argument suggested it would have been irrelevant, to identify the *group* of permanent replacements that took over the positions left vacant by the strikers. This, in view of their failure for reasons of inconvenience alone to produce relevant documents, supports, if

not an application of the "adverse inference" rule, at least a finding that the appellants did not carry their burden of proof.

The appellants would have us regard the disagreement between the Board and the administrative law judge as a difference of opinion as to the credibility of witnesses or the motivation for the companies' actions. It is neither. The Board merely drew different conclusions from the same facts. It could reasonably hold on this record that the appellants failed to make an initial showing that the strikers had been permanently replaced. The administrative law judge's credibility determinations remain intact.

Enforcement granted.