The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an Unincorporated Labor Organization, Appellee,

v.

TRANS WORLD AIRLINES, INC., Appellant.

K.C. International Airport, K.C.

The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an Unincorporated Labor Organization, Appellant,

v.

TRANS WORLD AIRLINES, INC., Appellee.

K.C. International Airport, K.C.

Nos. 86–2197, 86–2319.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1986.

Decided May 26, 1987.

Murray Gartner, New York City, for appellant.

John P. Hurley, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

This appeal by Trans World Airlines, Inc. (TWA) and cross-appeal by the Independent Federation of Flight Attendants (the Union) arise from the district court's judgment determining the relative rights of strikers, new hires, cross-overs and trainees to continued employment and reinstatement following the 1986 strike by TWA flight attendants. The district court granted preference in employment to newly hired strike replacements and union members who crossed the picket lines, thereby preventing reinstatement of full-term strikers with greater seniority to those positions. For the reasons discussed below, we affirm in part and reverse in part. In essence, we grant preference in current employment only to the new hires.

## I. BACKGROUND

The Union and TWA entered into a collective bargaining agreement establishing rates of pay, rules and working conditions.

During the spring of 1984, the parties served upon each other notices of intended change under section 6 of the Railway Labor Act (RLA), 45 U.S.C. § 156. After extensive negotiations and following the statutory "cooling off" period, the parties were unable to agree on the changes to be made and the Union commenced a strike on March 7, 1986.

Upon commencement of the strike, TWA hired approximately 1270 new flight attendants and told them they were being offered permanent employment. These new hires were assigned seniority as of March 7, 1986. TWA also utilized approximately 1280 cross-over flight attendants (cross-overs) who were credited with their prior length of service plus whatever time they accrued by working during the strike.[1] Also during the strike, TWA continued to hire new flight attendants to meet expected demand. TWA advised these trainees that they were TWA employees as of the first day of training.[2] Approximately 463 trainees had not completed their training when the strike ended.

At 10:00 p.m. on May 17, 1986, the Union made an offer to return to work. Notwithstanding this offer, TWA retained its new hires and cross-overs as employees without replacement by any of those attendants who remained on strike for its duration. TWA later recalled striking flight attendants as the need then arose in order of seniority. In addition, TWA placed the 463 trainees into permanent positions when they completed their training, which was after the strike had ended. These trainees received preference in job placement over those flight attendants who had not returned to work for the duration of the strike.

The Union thereupon instituted this action in the district court claiming that TWA discriminatorily and unlawfully denied reinstatement to more than 2000 striking flight attendants after they had ended the strike and had offered to return to work.

In a previous appeal to this court arising out of this litigation, TWA challenged the continued viability of those portions of the collective bargaining agreement that were not subject to bargaining and intended change. *Trans World Airlines v. Independent Fed'n of Flight Attendants*, 809 F.2d 483 (8th Cir.), *cert. granted*, —— U.S. ——, 107 S.Ct. 3183, 96 L.Ed.2d 671 (1987) (*TWA* I). Particularly at issue in the prior case was the duration of the agreement as to the union security and dues check-off provisions. We held in *TWA* I that the entire bargaining agreement did not expire just because the parties reached an impasse in their bargaining about certain items of compensation, expenses and bidding procedures. *Id.* at 490. This court also decided that the union security and dues check-off provisions of the bargaining agreement remained in effect because these provisions had not been reopened in the prior bargaining sessions. *Id.* at 492. Under the union security clause that had not been reopened, all flight attendants working for TWA were required to be union members and pay union dues in order to continue their employment with TWA.

These appeals challenge the district court's rulings on cross-motions by the Union and TWA for partial summary judgment. The district court held that the flight attendants in training when the strike ended were not permanent strike replacements and must yield their jobs to strikers who returned to work. The court decided that a permanent replacement

---

1. Cross-overs are those flight attendants who worked for TWA and were Union members prior to the strike. Some never went out on strike and others returned to work at various times during the strike. They kept their seniority as accrued prior to March 7, and also accrued additional seniority throughout the strike. At the end of the strike, they maintained their positions and TWA refused to displace them with returning full-term strikers with greater seniority.

2. Flight attendants are not qualified to service flights until they complete a training course and an operational experience flight. Prior to March 7, trainees attended the program on a tuition-paying basis and were not offered employment until after completion of the course. After the strike began, TWA placed the trainees on its payroll as of the first day of their training.

must actually perform work within a reasonable period of time and that two days was a reasonable period. Because none of the 463 trainees had completed their final training flights within two days after the strike, they did not perform services within a reasonable period of time and could not be considered permanent replacements. TWA appeals this holding in No. 86–2197.

The district court also held that the cross-overs and new hires were entitled to retain their jobs as against the claims of strikers. The Union appeals this holding in No. 86–2319.

We affirm the determination that those flight attendants holding a trainee status at the end of the strike may not be retained over striking employees. We also affirm the district court's ruling that new hires may retain their jobs as against the claims of strikers. We reverse, however, as to cross-overs. They may not retain their positions as against strikers with greater seniority.

## II. DISCUSSION

 Employees who are not working because of a labor dispute remain "employees" of the employer unless they obtain other work. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967); *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938). When the labor dispute is economic in nature,[3] however, the employer may hire permanent replacements for strikers in order to continue business operations. *Mackay Radio*, 304 U.S. at 345–46, 58 S.Ct. at 910–11. Once an employer hires permanent replacements, economic strikers are entitled to reinstatement only as vacancies occur. The employer is not required to discharge permanent replacements in order to rehire striking employees. *Id.*

### A. New Hires

The district court held that the 1220 "new hires" who started work on and after March 7, 1986 were employed as permanent replacements and not as additions to the workforce. The district court reached its conclusion by considering the circumstances in which they were hired. The court noted that although TWA anticipated a need for new attendants regardless of a strike, once the strike began, TWA made clear that it was hiring new flight attendants to replace strikers. The new hires crossed picket lines to receive formal offers of employment and TWA had earlier informed them that if they were hired after a strike, they would be considered permanent replacements for striking employees. The court further held that the replacements' subjective understanding of their employment status was irrelevant, that is, the new hires did not need to know and understand their permanent replacement status.

The Union argues that returning strikers should have preference over new hires because the new hires were merely additions to the workforce. It contends that TWA actively recruited new attendants prior to the strike, informing them that they would be hired whether or not a strike occurred. According to the Union, the new hires must be considered additions to the workforce, and not strike replacements. The Union also argues that no mutual understanding existed between the new hires and TWA that the new hires were permanent replacements for the strikers. Without a mutual understanding, the Union contends that the new hires cannot legally be deemed permanent replacements.

 Although TWA's statements to new hires may have been ambiguous prior to the strike, the undisputed evidence clearly shows that once the strike began, TWA employed the new hires as permanent replacements for the strikers. These applicants were informed prior to the strike that

---

**3.** An economic strike protects wages, hours, or terms and conditions of employment. An unfair labor practice strike protests an employer's commission of unfair labor practices. *George Banta Co. v. NLRB*, 686 F.2d 10, 14 n. 5 (D.C.Cir. 1982). For purposes of this lawsuit, the district court assumed, without deciding, that this strike was economic in nature. The question of whether the strike was economic or caused by unfair labor practices is the subject of separate litigation, now pending in the district court.

they would be hired as strike replacements. These applicants crossed picket lines, and TWA advised them as to their role as strike replacements once they began to work. Thus, we conclude that the district court correctly determined that the 1220 new hires were employed as permanent replacements and thus were not subject to displacement by returning strikers.

■ We reject the Union's contention that a mutual understanding must exist between the new employees and TWA that the new hires are in fact permanent replacements. The Union argues that the new hires must have subjectively understood that they were permanent replacements in order to create the necessary mutuality of understanding.

The law, however, does not require mutuality. *NLRB v. Murray Products*, 584 F.2d 934 (9th Cir.1978), upon which the Union relies, does not require mutual understanding. Rather, *Murray Products* holds that an employer's unilateral and undisclosed decision to designate new employees as permanent replacements is inadequate to actually accord them permanent status. *Id.* at 939. In the present case, TWA clearly communicated its decision to offer permanent employment to the new hires. Accordingly, the new hires are permanent replacements and striking employees may not displace them.

### B. Cross-overs

The district court held that the approximately 1280 striking employees who "crossed over" and went back to work during the strike were also permanent replacements and not subject to displacement by full-term strikers with greater seniority.

The district court relied upon *Randall, Div. of Textron, Inc. v. NLRB*, 687 F.2d 1240 (8th Cir.1982), *cert. denied*, 461 U.S.

914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983), in concluding that TWA could legitimately offer cross-overs permanent replacement status. The district court noted that *Randall* and *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), are broadly protective of employees who work during a strike and that the offer of permanency to cross-overs did not discriminate on the basis of union activity.

Upon examination of the applicable law, however, we cannot agree with the district court's assessment. Most importantly, the terms of the bargaining agreement prevent the cross-overs from being considered permanent replacements. In *TWA* I, *supra*, this court decided that those portions of the agreement not opened for bargaining were not terminated at impasse, but remained in effect. 809 F.2d at 492. Accordingly, the union security clause which provides that union membership is a condition of continued employment with TWA remains in effect. *See* 45 U.S.C. § 152, Eleventh (authorizing "closed shop" agreements).

■ Thus, all cross-overs must retain their union membership. TWA may not discriminate among union members based on the degree of their union activity. Accordingly, TWA may not accord cross-overs permanent replacement status and prevent full-term strikers from displacing cross-overs with less seniority because such action impermissibly discriminates among union members based on the degree of their union activity.[4]

We note that many of the cross-overs attempted to resign from the Union. Assuming, without deciding, that *Pattern Makers' League of North America v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985), applies to cases arising under the RLA,[5] union members may re-

---

4. The union security clause also requires that new hires obtain union membership in order to continue employment with TWA. New hires, however, were not union members when they began work during the strike. Thus, new hires cannot be the subject of discrimination based upon union loyalty and activity.

5. In this context, the RLA's authorization of union shop agreements may be significant. Un-

der the RLA, union members apparently need only pay dues if they so desire. *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 439, 104 S.Ct. 1883, 1887, 80 L.Ed.2d 428 (1984). Whether a union organized under the RLA may fine its members for working during a strike is an open question which we need not decide here.

sign from all obligations except that of paying dues and the Union may not fine them for working during a strike. *Id.* at 3071 & n. 16. In the present case, cross-overs have apparently ceased their union memberships except for payment of dues. This action only exacerbates the division among union members along lines of union loyalty. Furthermore, if the Union cannot penalize its members for working during a strike, neither may TWA reward those members with permanent replacement status. Accordingly, the cross-overs cannot be granted permanent replacement status because such action discriminates on the basis of union activity.

Our review of the law supports our conclusion that the cross-overs do not acquire the status of permanent replacements. In *NLRB v. Erie Resistor,* the Supreme Court upheld the NLRB's decision that an award of super-seniority to permanent replacements and cross-overs unlawfully discriminated against those who engaged in union activity. 373 U.S. at 231–32, 83 S.Ct. at 1147. Although TWA has not awarded super-seniority to the employees who worked during the strike, several of the concerns voiced by the Court in *Erie Resistor* are applicable to the status of the cross-overs here.

The Court disapproved of super-seniority because the award operated to the detriment of strikers as compared to non-strikers; it in effect offered an inducement to abandon the strike; and it created a long-term division among the workforce. *Id.* at 231, 83 S.Ct. at 1147. Although an award of super-seniority brings these concerns into a sharper focus than does the conferring of permanent replacement status to cross-overs, these concerns are nonetheless present. Awarding the cross-overs permanent replacement status differentiates employees on the basis of their union activity, induces employees to abandon the strike and is likely to create long-term conflict and division within the workforce of those working together under the union security clause.

Cases that have followed *Erie Resistor* are more explicit concerning the treatment of cross-overs. In *George Banta Co. v. NLRB,* 686 F.2d 10 (D.C.Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983), the court stated that the nature of the benefit conferred on cross-overs was irrelevant. *Id.* at 19. Rather, an employer may not divide the workforce into those who engaged in strike activity and those who did not. *Id.*

The Seventh Circuit has held that an employee who abandons the strike and returns to his pre-strike position is not a permanent replacement. *International Ass'n of Machinists & Aerospace Workers v. J.L. Clark Co.,* 471 F.2d 694, 698 (7th Cir.1972). The district court, however, felt that *J.L. Clark* was probably not good law in light of *Giddings & Lewis, Inc. v. NLRB,* 675 F.2d 926 (7th Cir.1982). We do not agree. *Giddings* held that during a layoff, permanent replacements and reinstated strikers have a right of recall on the basis of seniority over unreinstated strikers. *Id.* at 930. Thus, *Giddings* in no way casts doubt on the rule that cross-overs returning to their old positions are not permanent replacements. Furthermore, the Seventh Circuit has recently approved reliance on *J.L. Clark. See Air Line Pilots Ass'n (ALPA) v. United Air Lines,* 614 F.Supp. 1020, 1046 (N.D.Ill.1985), *aff'd,* 802 F.2d 886, 898 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

*Randall, supra,* relied on by the district court, does not control the decision in this case. The district court determined that *Randall* implicitly approved the grant of permanency to cross-over employees. At issue in *Randall,* however, was the definition of vacancy, and the court merely upheld the NLRB's decision that the employer's practice of offering "special-rated" jobs to employees already working rather than unreinstated strikers unlawfully discriminated on the basis of union activity because Randall was offering an "additional preference besides permanence." *Id.* at 1246. The status of cross-over employees as permanent replacements was not an issue in that case. Furthermore, *Randall* arose under the NLRA and the parties were not bound by a closed shop agree-

ment. Thus, we deem *Randall* inapplicable to the present case.

Accordingly, we hold that unreinstated strikers are entitled to displace cross-over employees with lesser seniority.

## C. Trainees

The district court held that the 463 trainees who had not completed their training at the time the strike ended did not become permanent replacements and thus were subject to displacement by returning strikers. The court primarily relied on *H. & F. Binch Co. v. NLRB*, 456 F.2d 357 (2d Cir. 1972). In writing for the *Binch* court, Judge Friendly stated that although a permanent replacement need not actually appear on the job in order to displace a striking employee, the replacement must report within a reasonable period of time. *Id.* at 362. The district court here decided that two days constituted a reasonable time, that is, those trainees who did not complete their operating experience flights within two days of the Union's unconditional offer to return to work could not be considered permanent replacements.

TWA argues that the district court's "2-day rule" is totally without foundation in the law. It contends that trainees need not be fully qualified or actually working in order to be deemed a permanent replacement, relying on *Air Line Pilots Ass'n (ALPA) v. United Air Lines*, 614 F.Supp. 1020 (N.D.Ill.1985), *aff'd in part & rev'd in part*, 802 F.2d 886 (7th Cir.1986), *cert. denied*, —. U.S. —, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and several cases arising under the National Labor Relations Act (NLRA). TWA thus asserts that all persons in training at the time of the Union's offer to return to work on May 17 were permanent replacements and not subject to displacement by returning strikers.

In our view, the Seventh Circuit's decision in *Air Line Pilots Ass'n (ALPA) v. United Air Lines, supra,* is dispositive of this issue. We observe that the district

court did not have the benefit of the Seventh Circuit's *ALPA* opinion because it was published after the district court's decision in this case. On appeal, however, the Seventh Circuit reversed the district court and rejected the rationale upon which TWA relies.

In *ALPA*, the airline hired some 500 pilots to work on the first day of the strike, but the employer required these pilots to undergo training before assuming flight duties.[6] The pilots refused to cross picket lines and United refused to consider them employees, thus making their employment contingent upon crossing the picket lines. The district court had determined that the trainees were entitled to employee status as of the first day of the strike in accordance with the offer by United and acceptance by the student pilots. 614 F.Supp. at 1042. Accordingly, the district court held that these trainee-pilots were protected by the RLA and the airline had unlawfully conditioned their employment on crossing a picket line. *Id.*

On appeal, the Seventh Circuit reversed the district court's determination that the pilot trainees qualified as employees. The Seventh Circuit ruled that an employee as defined by the RLA must be someone who has actually *"performed services for the employer under that employer's supervision."* 802 F.2d at 913 (emphasis added). The court based its conclusion on the plain and specific language of the RLA, which provides RLA coverage to " 'every air pilot or other person *who performs any work as an employee* or subordinate official of such carrier or carriers, *subject to its or their continuing authority to supervise and direct the manner of rendition of his service.'* " *Id.* at 911 (quoting 45 U.S.C. § 181) (emphasis by the court). Accordingly, the trainees did not receive employee status and the protections of the RLA.

▮ We follow the Seventh Circuit's ruling in *ALPA*.[7] The trainees in question,

---

6. The pilot trainees in question were already trained pilots at the time of their "employment" with United. The training course familiarized them with United's planes and practices.

7. We note that the positions taken in *ALPA* differ from the present case, that is, the union in *ALPA* argues that the trainees were employees whereas here, the Union argues that the

although hired by TWA, never performed any services for TWA under its supervision prior to the Union's offer to return to work. Thus, they cannot be considered employees within the meaning of the RLA.

We acknowledge that the circumstances surrounding the pilot trainees in *ALPA* differ from the situation here. Specifically, United expressly told the pilot trainees that they were not employees and they did not receive a salary pursuant to a signed agreement with United. In the present case, the opposite occurred: TWA told the trainees that they were employees and they received a salary.

These differences, however, are irrelevant under the RLA. The RLA does not extend its coverage based upon the employer's labelling of persons as employees or the payment of salary. Rather, RLA coverage is determined by the *work the person performs* under supervision of the employer. This performance factor is determinative in trainee situations because it is the only requirement that the statute explicitly includes. Thus, clear statutory language supports the conclusion that the trainees are not employees protected by the RLA because these trainees were not "performing any work" of the carrier by any stretch of the imagination.

This conclusion is further supported by the consequences resulting from the valid closed shop agreement that remains in effect between the parties in this case. The contract provides that union membership is a condition of continued employment with TWA. Thus, if the trainees were to be considered as employees, they would need to join the Union and pay dues. Furthermore, the training school would become a subject open to collective bargaining. None of these consequences occurred or have even been contemplated by the parties. In addition, our previous decision in *TWA* addressed the continuing obligation of Union members to pay dues. This court did not require trainees to pay dues.

Additionally, the history of TWA's training program is instructive. Prior to the strike, trainees were not considered TWA employees by anyone. Only when the strike began did TWA attempt to accord the trainees employee status. TWA's attempt failed because these trainees did not perform services before the strike ended. To conclude otherwise would allow an employer to amass a trainee pool capable of replacing the entire striking workforce at some future date after the strike has ended. Such a result is inconsistent with the RLA's grant of protections to those persons who actually perform services for the employer.

Finally, cases decided under the NRLA also support the rationale that the trainees should not be considered employees. Under the NLRA, employees remain employed and are protected from discharge while they are on strike. 29 U.S.C. § 152(3). *Mackay Radio, supra,* recognized an exception to the statute's general rule by holding that an employer may hire replacements for strikers and need not fire the replacements once the strike has ended. 304 U.S. at 345–46, 58 S.Ct. at 910–11. *Mackay Radio* is recognized as an exception to the general rule. *Giddings,* 675 F.2d at 926 (quoting *NLRB v. Mars Sales & Equipment Co.,* 626 F.2d 567, 572 (7th Cir.1980)). Courts have been reluctant to extend the *Mackay Radio* exception. *See, e.g., Erie Resistor,* 373 U.S. at 232, 83 S.Ct. at 1147; *J.L. Clark,* 471 F.2d at 698.

Whether the trainees can be considered permanent replacements within the *Mackay Radio* exception depends upon the rationale used in *Mackay Radio.* In that case, the Court employed a balancing test that weighed the negative impact of hiring permanent replacements on union activity against the business justification for doing so.

Applying this balancing test to the trainees, the trainees do not obtain the status of permanent replacements. During the strike, TWA's interest in continuing its ser-

---

trainees were not employees. The rule applies regardless of which party contends that trainees, not on the job, qualify as employees. The

Seventh Circuit's holding is based on an interpretation of statutory language and binds all parties.

vice required the replacement of strikers. The training of new people to fill strikers' positions was appropriate in fulfilling TWA's interest. People who completed their training during the strike and went to work clearly fit within the *Mackay* exception. They filled positions left open by strikers and permitted TWA to operate more efficiently. Thus the balance tips in favor of TWA.

The balance, however, is different for the trainees who had not completed their training when the strike ended. The strike ended when the Union unconditionally offered to return to work. Thus, TWA could operate with returning strikers. It established no business need to put trainees into working positions because all vacant positions could be filled with returning strikers. Thus, while TWA shows no business justification for employing 463 trainees ahead of regular employees who have ended the strike, TWA's utilization of trainees to prevent Union members from returning to their jobs causes great damage to the Union.

Accordingly, even applying the rationale of NLRA decisions, unreinstated strikers are entitled to those positions now held by the 463 trainees.

Although we do not adopt the district court's two-day rule, the status of the trainees remains the same under our reasoning as under the district court's two-day ruling. No trainee completed his or her training between the end of the strike, May 17, and May 20. The district court's two-day rule is more generous than what we have determined the RLA to allow but the Union has not objected to the district court's ruling. Thus, we conclude that any trainee who had not yet performed services for TWA under its supervision by May 17 is not a permanent replacement.[8]

### III. CONCLUSION

For the reasons stated above, we affirm the district court's order granting employ-

ment preference to the new hires and denying such preference to the trainees. We reverse the district court as to the cross-overs. We remand this case and direct the district court to modify its judgment consistent with this opinion. TWA is directed to pay one-half the Union's costs in pursuing its cross-appeal as well as one-half of the Union's costs incurred in defending TWA's appeal.

---

8. After oral argument in this case, TWA filed a Rule 60(b)(3) motion seeking relief from the district court's decision concerning the trainees. TWA contends that the district court relied on facts that were misrepresented to the court.

The district court denied TWA's motion on February 17, 1987, and directed that the motion be forwarded to this court. Today's opinion moots the issue pressed by TWA and we express no further comment on its motion.