**RANDALL, DIVISION OF TEXTRON, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 81–1831.**

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1982.

Decided Sept. 9, 1982.

Rehearing Denied Oct. 27, 1982.

**7.** The Court expresses its gratitude to appointed counsel for his thorough and diligent representation of petitioner.

Michael W. Hawkins, Robert E. Kaplan, Cincinnati, Ohio, for petitioner; Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, of counsel.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, William F. Wachter, Diana Orantes Ceresi, Attys., N. L. R. B., Washington, D. C., for respondent.

Before ARNOLD, Circuit Judge, STEPHENSON, Senior Circuit Judge, and HANSON,* Senior District Judge.

ARNOLD, Circuit Judge.

This matter comes before the Court on petition of Randall, Burkhart/Randall Division of Textron, Inc. (Randall) for review of an order of the NLRB holding that Randall committed unfair labor practices in connection with an economic strike by the employees at Randall's plant in Blytheville, Arkansas, in 1977. The case presents several issues arising from the manner in which strikers were reinstated to Randall's active work force following the strike. The primary dispute concerns whether the NLRB correctly determined that Randall's policy of offering special-rated jobs to unreinstated strikers only if no one in the active work force was qualified for and wanted the job, was an unfair labor practice. We enforce the NLRB's order with respect to that issue. With respect to the remaining issues, we grant enforcement in part and deny enforcement in part.

I.

Randall's Blytheville plant manufactures automotive trim such as body side moldings, wheel openings, hub caps, and headlight openings. Its customers include all the major automobile manufacturers. Randall's production schedule varies in response to changes in weekly customer orders and in the size of the finished-goods inventory. In meeting production needs, the plant manager of course strives to operate the plant in the most efficient manner with the fewest employees. On the average, Randall employs approximately 400 production and maintenance employees.[1] Randall's need for employees occasionally varies with changes in its production schedule, but according to the plant manager, the size of the work force ordinarily remains stable (Tr. 663).

Randall's plant is divided into a number of different departments, and employees within the various departments are classified as either production workers or "special-rated" workers depending on the nature of the tasks they perform. Production positions require no special skills and are all compensated at the same rate of pay. Special-rated positions, on the other hand, do require additional skills and consequently are more highly compensated.[2]

---

* The Hon. William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. These employees are members of the United Automobile, Aerospace, and Agricultural Implement Workers of America, Local 1249, hereinafter referred to as the Union.

2. Examples of special-rated jobs are buffing, rolls, tool and die, maintenance, and inspection.

On occasion, Randall shifts its employees within and between departments in response to changes in its production requirements. Under the three-year collective-bargaining agreement with the Union which expired September 1, 1977, Randall could temporarily transfer any employee to a different position for ten days or less without restriction. Randall also had the right to move an employee permanently between departments to a position at the same or a lower pay level. However, whenever a special-rated position opened up, the agreement required Randall to follow a posting procedure, allowing any interested employee to bid on the job. The contract specified that the job should be awarded to the most qualified bidder or, among equally qualified bidders, to the one with the most seniority. Only if the bid procedure produced no eligible, qualified applicants could Randall fill special-rated openings from outside the workforce.

When the collective-bargaining agreement between Randall and the Union expired in 1977, the parties were unable to agree to a new contract. On September 8, 1977, the employees struck to bolster their bargaining position. The strike lasted until October 16, 1977, when the Union accepted Randall's latest offer and made an unconditional request to return to work. All the employees in the bargaining unit, except for five janitors and one production worker, joined in the strike at its outset. During the course of the strike, Randall continued operations by hiring permanent replacements for the strikers. In addition, a steady stream of individual strikers requested leave to return to work during the course of the strike. On September 19, 1977, Randall began keeping a list of such strikers (hereinafter referred to as the sign-up list). Thereafter, Randall offered job openings to the people on the sign-up list in preference to hiring permanent replacements.

Although the sign-up list was created and maintained for the benefit of voluntarily returning strikers, there was one occasion on which Randall allegedly solicited employees to sign the list. About two weeks after the strike began, employee Woodrow Robinson called the plant manager and asked to return to work. Because he feared retaliation by other strikers if he came to the plant to sign the list, he asked that someone bring the list to him. When the personnel director brought Robinson the list, Robinson noticed that he was being observed by his neighbor and fellow striker, Gary Stevens. To divert suspicion from himself, Robinson suggested that the personnel director ask Stevens if he desired to return to work. The personnel director obliged, Stevens said he was not interested, and that was the end of the incident.

Over the course of the strike, Randall hired 422 permanent replacements, not all of whom stayed on. At the end of the strike, the active work force numbered approximately 360, including both permanent replacements and previously reinstated strikers.[3]

Randall adopted the following procedure for recalling and reinstating strikers after the strike. When additional production workers were needed, Randall first recalled persons on the sign-up list, in order of signing. After exhausting the sign-up list, Randall recalled persons on the list submitted by the Union, in order of seniority. When special-rated positions became available, Randall first attempted to fill them with workers from within the plant, if any had the necessary qualifications. If no one within the plant had previously performed the job, Randall then recalled the first qualified striker appearing on the above-mentioned lists.

Between September, 1977, and February, 1978, Randall reinstated some 40 strikers. During this period Randall also recalled 13 permanent replacements who were alleged-

---

**3.** The work force was smaller at the end of the strike than at the beginning because Randall had built up its finished-goods inventory to a high level prior to the strike to allay its customers' concern about potential disruptions in ser-

vice during the strike. This buildup was not depleted until February, 1978, which is when Randall began reinstating strikers in large numbers.

ly on leaves of absence, transferred five security guards into production positions, reinstated two permanent replacements (the Turnages) who voluntarily quit and then asked to return a week later, and transferred at least 20 permanent replacements from production to special-rated positions. See General Counsel's Exhibit 29(B). After February, 1978, Randall began recalling strikers in larger numbers, and as of March 29, 1979, all but 17 of the 389 strikers had been recalled.

Returning strikers found their working conditions and benefits somewhat changed. Under the expired collective-bargaining agreement, more senior employees had been permitted to transfer to more desirable shifts, but after January 1, 1979, Randall refused to allow employees to use seniority for shift preference. Also, the strikers' insurance coverage was suspended until 60 days after they returned because of the hiatus in their active work status.

On January 16, 1978, the Union filed an unfair-labor-practice charge alleging a variety of statutory violations. The NLRB issued a complaint against Randall on March 1, 1978, and Administrative Law Judge (ALJ) Robert Cohn presided over the hearing on the complaint, which took place on various dates from November, 1978, to September, 1979. The ALJ made his decision on August 14, 1980, holding that Randall had violated § 8(a)(1) and (3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (3), in six respects: (1) by preferring permanent replacements to unreinstated strikers for special-rated jobs, (2) by recalling 13 permanent replacements from alleged leaves of absence rather than recalling strikers, (3) by rehiring the Turnages instead of recalling strikers, (4) by transferring five security guards into production positions instead of recalling strikers, (5) by failing to allow returning strikers to exercise shift preference on the basis of seniority, and (6) by interrupting the returning strikers' insurance coverage. On July 21, 1981, the NLRB adopted the ALJ's recommended order in full, with the additional finding that Randall had also committed an unfair labor practice in soliciting Gary Stevens to abandon the strike. Ran-

dall applied to this court for review of the NLRB's order, and the NLRB cross-petitioned for enforcement.

## II.

### A. Vacancies In Special-Rated Jobs

The central issue in this appeal stems from the NLRB's holding that Randall should have considered unreinstated strikers in preference to permanent replacements for openings in special-rated positions. The NLRB determined that Randall's policy of first offering all special-rated job openings to employees on the payroll instead of to unreinstated strikers discriminated against the strikers on the basis of their participation in union activity. See *Little Rock Airmotive, Inc. v. NLRB*, 455 F.2d 163, 165–168 (8th Cir. 1972), adopting *Laidlaw Corp. v. NLRB*, 414 F.2d 99 (7th Cir. 1969), (an employer must reinstate economic strikers when vacancies arise for which the strikers are qualified, unless there is a valid business reason for denying reinstatement), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970).

Randall argues that its reinstatement policy was not discriminatory because it did offer all "vacancies" in both production and special-rated positions to unreinstated strikers. In defining vacancy, Randall distinguishes between job openings created and filled by transfers within the existing active work force and job openings resulting from expansion of the work force. According to Randall's interpretation, only the latter openings are vacancies which the law requires to be offered to unreinstated strikers.

The NLRB reached a different conclusion regarding the definition of vacancy. The NLRB agreed with Randall that vacancies did not appear every time production workers were reshuffled among various production jobs, but it did not agree that transfers to special-rated jobs fell in the same category. Instead, the NLRB reasoned that because special-rated jobs require particular skills, they are not interchangeable either with production jobs or with each other. The NLRB's conclusion that special-rated

job openings were vacancies which should have been offered to strikers is supported by the posting procedure for such positions contained in the expired collective-bargaining agreement. Thus, prior to the strike, Randall did not unilaterally move employees into special-rated openings, but rather awarded those positions to the most qualified and senior employees who applied. The NLRB decided that Randall's post-strike policy of preferentially considering active employees for special-rated openings discriminated against strikers, because at least some of the openings appeared when replacements left. The preference was given regardless of how an opening arose, and not just when Randall was reshuffling its work force.[4]

In deciding which of the above definitions of vacancy to accept, a brief overview of the development of the right to reinstatement following an economic strike will be helpful. The Supreme Court established the basic ground rules in *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). *Mackay Radio* identifies the two competing interests which must be reconciled in defining the scope of the right to reinstatement: the employees' right to strike and the employer's right to carry on his business. The Court decided that an employer is entitled to solicit replacements by guaranteeing them a measure of permanence, even though as a result strikers may be induced to abandon the strike to avoid being replaced. On the other hand, strikers remain employees[5] who are entitled to be reinstated to vacancies, although they may not displace permanent replacements.

The Supreme Court restricted the extent to which employers may guarantee permanence to replacements in *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). The employer in *Erie Resistor* had announced during an eco-nomic strike that all permanent replacements and early-returning strikers would receive a 20-year seniority credit to shield them from future layoffs. The NLRB determined that such a grant of "superseniority" (which as a practical matter broke the strike because of the large number of strikers who were induced to return to work) posed an unacceptable disincentive to the employees' right to engage in concerted activity. In enforcing the NLRB's order, the Supreme Court noted that the NLRB is best equipped to balance the competing interests of employers and employees.

> Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life, [citations omitted] and of "[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases" from its special understanding of "the actualities of industrial relations." *Labor Board v. United Steelworkers*, [357 U.S. 357 [78 S.Ct. 1268, 2 L.Ed.2d 1383] (1958) ] at 362–363 [78 S.Ct. at 1271]. "The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Labor Board v. Truck Drivers Union*, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 [1957].

*Erie Resistor*, 373 U.S. at 236, 83 S.Ct. at 1149.

In a pair of 1967 decisions further defining the framework for balancing employers' and economic strikers' competing interests, the Supreme Court again noted that the actual balancing task is best left to the NLRB. *NLRB v. Great Dane Trailers*, 388

---

4. To similar effect, see *MCC Pacific Valves*, 244 NLRB 931 (1979) (employer could not prefer replacements to strikers when filling job openings, at least some of which arose because of the departure of permanent replacements), *enforcement granted in part and denied in part without opinion*, 665 F.2d 1053 (9th Cir. 1981).

5. See § 2(3) of the Act, 29 U.S.C. § 152(3) ("employee" includes "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . .").

U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), presented the question of whether an employer committed an unfair labor practice in refusing to pay strikers the accrued vacation benefits which it paid to permanent replacements, early-returning strikers, and nonstrikers. The Court upheld the NLRB's decision in favor of the strikers, finding that the employer's conduct was " 'inherently destructive of employee interests.' " 388 U.S. at 33, 87 S.Ct. at 1797 (quoting *NLRB v. Brown*, 380 U.S. 278, 287, 85 S.Ct. 980, 986, 13 L.Ed.2d 839 (1965)). The Court set up the following balancing test: if it can be shown that the employer's conduct adversely affected employee rights, the burden shifts to the employer to prove a legitimate and substantial business justification. If the harm to employee rights is slight, and the employer shows business justification, the burden then shifts back to the charging party to show discriminatory motivation. However, no proof of anti-union motivation is required if the harm to employee rights is relatively great or if the employer fails to show business justification.

*Great Dane* emphasized that within this general framework, it is the province of the NLRB "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." 388 U.S. at

33–34, 87 S.Ct. at 1797–98. Similarly, in *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) (the right to reinstatement does not depend on whether an employer has a vacancy on the specific day a striker applies to return to work), the Supreme Court confirmed that the balancing function "is the primary responsibility of the Board and not of the courts . . . ." 389 U.S. at 378, 88 S.Ct. at 545.[6]

In sum, the framework articulated by the Supreme Court identifies the competing interests of employer and employee, sets our general guidelines for decision-making, and recognizes the NLRB's superior expertise in striking specific balances within those guidelines. Thus, unless the NLRB has clearly misapplied the law or misperceived the facts, we will not second-guess its judgment.

In holding that Randall should have offered special-rated openings to strikers, the NLRB decided that Randall had violated the strikers' right to reinstatement without proving a business justification.[7] The NLRB followed its decision in the analogous case of *MCC Pacific Valves, supra* n.4.[8] In *MCC Pacific Valves*, as here, the employer claimed to be justified in filling openings with active employees because it was internally restructuring its work force. The NLRB rejected that argument, finding that

---

**6.** For a recent statement of the Supreme Court's deference to the NLRB in matters of applying labor policy to specific fact situations, see *Charles D. Bonanno Linen Service, Inc. v. NLRB*, - -- U.S. ——, ——, 102 S.Ct. 720, 728, 70 L.Ed.2d 656 (1982) (upholding Board's decision to refuse to accept impasse as basis for employer's withdrawal from multi-employer bargaining unit) ("[T]he dissenting Justices would have us substitute our judgment for those of the Board with respect to the issues that Congress intended the Board should resolve. This we are unwilling to do.").

**7.** Randall argues in its brief that the NLRB's decision was unjustified because there was no finding of anti-union motivation. However, under *Great Dane* and *Fleetwood Trailer*, such a finding is unnecessary unless the harm to employees is slight and the employer proves a business justification. We cannot agree that the harm to employees in this case was

"slight," and the Board found that Randall had not proved a business justification.

**8.** Randall urges the NLRB should have looked either to *Bancroft Cap Co.*, 245 NLRB 547 (1979), or *Kennedy & Cohen of Georgia, Inc.*, 218 NLRB 1175 (1975), instead of *MCC Pacific Valves* for its definition of vacancy. *Bancroft Cap* held that an employer could recall laid-off employees before reinstating strikers where the layoffs "were for periods of only 2 to 7 days and were due to shortages of materials," 245 NLRB at 547 n.1. *Kennedy & Cohen* held that an employer could transfer a supervisor to a sales position instead of reinstating a striker, because due to a business slowdown, the employer did not need more employees. Both of these cases illustrate that employers may refuse to reinstate strikers to certain positions *if* they have legitimate business reasons. As discussed below, the NLRB found Randall's business justification to be unconvincing.

"at least some job vacancies occurred because of the departure of strike replacements from those jobs .... In opening those jobs for bidding, and in filling them, Respondent was *not* entitled to prefer strike replacements then on the payroll to qualified strikers awaiting reinstatement." 244 NLRB at 933.

The employer in *MCC Pacific Valves* complained that if it were required to reinstate strikers to positions that could be filled by active employees, the net result would be either overemployment or displacement of employees who were entitled to remain on the job. However, the NLRB found that the employer was adding to its work force at the same time that it gave bid preference to active employees. The practical effect of the employer's scheme was to reserve jobs in higher classifications to nonstrikers. Strikers were eventually reinstated, but only to jobs in which no active employee was interested.

Randall asserts that *MCC Pacific Valves* is inapplicable because the record here does not show discrimination against strikers during expansion of the special-rated work force.[9] We think a more relevant question is whether Randall discriminated against strikers when it was hiring employees for any portion of its work force, not just the special-rated segment. The record shows that continuously from the end of the strike, while certain strike replacements departed, others were transferred to special-rated jobs, and still others were rehired and recalled from inactive status, all during the same periods of time as some strikers were being reinstated.[10] Whether or not these events were causally related, the practical

effect of Randall's procedure, just like that in *MCC Pacific Valves*, was to make it less likely that strikers would be reinstated to higher-paying positions. Randall's procedure was discriminatory in the same sense as the grant of superseniority in *Erie Resistor*; Randall gave an additional preference besides permanence to those who remained at work as opposed to those who struck, despite the fact that the latter were still "employees" for legal purposes.

■   The NLRB applied the correct legal principles, and the record contains substantial evidence supporting its factual conclusions. Although we recognize that the balance between employer and employee rights in this case is difficult to strike, in circumstances where the NLRB is better equipped to apply the law to the facts, we decline to reverse its judgment unless it is clearly wrong.

Randall argues that the recent case of *Giddings & Lewis, Inc. v. NLRB*, 675 F.2d 926 (7th Cir. 1982), shows that the NLRB's judgment in the instant case is clearly wrong. The question in *Giddings & Lewis* was whether unreinstated economic strikers have a right to reinstatement prior to the recall of laid-off permanent replacements with less seniority. The employer's business justification for preferring laid-off employees to strikers was preservation of the current work force. The NLRB held that giving preference to all laid-off employees regardless of the length or cause of their layoffs was equivalent to a grant of superseniority and therefore was illegal discrimination against strikers. *Giddings & Lewis, Inc.*, 255 NLRB No. 93, 106 LRRM 1391 (1981). The Seventh Circuit reversed, hold-

---

**9.**  "There is absolutely no evidence in the record to suggest that permanent replacements were transferred from production to special-rated jobs at a time when the Company [Randall] was adding to its work force in special-rated jobs." Petitioner's Brief at 25. This argument reflects Randall's basic definition of "vacancy" as an opening arising during expansion of the work force.

**10.**  Although the overall size of Randall's work force decreased during the first few months following the strike, Randall still needed to add and transfer employees to make up for depar-

tures of replacements. For example, the General Counsel showed that between the end of the strike and the end of 1977, 40 replacements departed, and 59 replacements were transferred to different jobs (13 from production to special-rated jobs). See General Counsel's Exhibit 29(B), ALJ's opinion at 8. Also during that time, 13 replacements were recalled from so-called leaves of absence, two replacements were rehired after they had quit, and eight strikers were reinstated. See General Counsel's Exhibits 29(B), 29(D).

ing that because layoffs do not terminate the employment relationship, they do not create vacancies to which strikers are entitled to return. The Seventh Circuit viewed the employer's practice simply as a mechanism to assure permanence to permanent replacements, permissible under *Mackay Radio.*

The case at bar differs from *Giddings & Lewis* in that here the NLRB's order does not infringe on the permanence of replacements. It simply requires that special-rated openings must not be preferentially offered to currently working personnel. It does not require that permanent replacements be discharged or displaced. In *Giddings & Lewis*, the Seventh Circuit took the view (with which we have no quarrel) that the lay-off of a permanent replacement, who had been given a definite expectation of recall, did not amount to a "vacancy." Here, by contrast, the Board permissibly treated openings in special-rated jobs as "vacancies." We find it unnecessary and undesirable to second-guess the NLRB's judgment. Neither the employer's nor the employees' interests are clearly preeminent, and the NLRB is the most appropriate body to decide between them.

### B. *Leaves of Absence*

The NLRB found that Randall violated the Act in recalling 13 permanent replacements to work on December 5, 1977, instead of reinstating strikers to those positions. Randall argued that the 13 replacements were entitled to return to work because they were on leaves of absence. According to *Bancroft Cap, supra*, 245 NLRB at 547 n.1, 551, if an employee on layoff or leave of absence has a reasonable expectation of recall, his employment relationship has not terminated and his position does not become a vacancy which must be filled by a striker.

The NLRB did not reach the question of whether these 13 replacements could reasonably expect to be recalled, because there was insufficient proof that they were in fact on leaves of absence. The 13 apparently ceased working for a variety of reasons,[11] but none of their departures was originally an official leave of absence. That label was attached later, when Randall decided to recall them to work.[12] The NLRB determined that these 13 employees did not depart from Randall on leaves of absence, and that Randall therefore violated the Act in preferentially recalling permanent replacements instead of strikers. We conclude that substantial evidence on the record as a whole supports the NLRB's determination. Randall contends that the recall of permanent replacements does not demonstrate the existence of vacancies, but we hold otherwise. Since Randall decided on December 5, 1977, that it could accommodate 13 additional active workers, it should have recalled strikers, not permanent replacements who had left the work force entirely.

### C. *The Turnages*

In December of 1977, Randall rehired a pair of strike replacements who had voluntarily quit. Cheryl and Louis Turnage left their jobs at Randall on December 8 and 14, respectively, after informing the personnel director that they had sold their house and were moving to California. Shortly thereafter, they asked to be reinstated to their

11. Gerald Hopkins, the only one of the 13 who testified at trial, explained that he called in sick one day. The following day, when he returned to work, his supervisor informed him the company could no longer use him, which he interpreted to mean he was fired.

12. The personnel director testified that the recalls came about when he discovered paychecks being issued to employees who were not at the plant. He called the employees, told them they would be written off if they did not return to work immediately and *then* placed a "leave of absence" notation on their files. See Transcript at 767–69. He admitted that when he first contemplated contacting the 13, he "didn't have any idea what the status of those people were." *Id.* at 767. Randall argues that there was a good reason for granting a leave of absence to each of these employees, and thus that is the most suitable interpretation of their status regardless of when the official action was taken. We disagree. If we were to permit such a retroactive grant of leaves of absence, we would be sanctioning a simple method to avoid reinstating strikers.

jobs, because their house sale had fallen through. The company decided it could use them and rehired them both on December 27. The Turnages soon completed the sale of their house, and they again quit on December 30 and January 13, respectively.

The NLRB decided that Randall's reinstatement of the Turnages was no different from its recall of the 13 employees on "leaves of absence." In the Board's view, the positions to which the Turnages returned were also vacancies which should have been offered to strikers.

■ Randall argues that because the Turnages returned on a temporary basis, their positions were not vacancies which could have been filled by strikers. See *Certified Corp.*, 241 NLRB 369, 373 (1979) (*Laidlaw* reinstatement rights did not apply to a temporary part-time position which was not substantially equivalent to a striker's former full-time employment). The General Counsel disputes Randall's assertion that it rehired the Turnages only on a temporary basis, but the record bears out the temporary nature of their return.[13] The temporary position in *Certified Corp.* was created to cope with production needs, whereas here Randall rehired the Turnages as a favor to them, but whatever the reason, the net result is the same. The existence of a temporary job is not the equivalent of a vacancy to which a striker should have been reinstated.

### D. *Security Guards*

The NLRB also treated Randall's transfer of five security guards into production positions at the beginning of January, 1978, in the same way as the recall of the 13 employees on "leaves of absence." During the strike, Randall hired some 12 security guards to provide security for the plant. Randall later determined that it did not

need such a large security force, and accordingly it cut back to a total of seven security guards. Randall transferred the remaining guards into production positions because it hired them in "good faith" and didn't wish to terminate them.

■ The Board found that Randall made no commitment of permanence to the security guards. On the contrary, the guards were hired during a period when Randall perceived a need for increased security because of the strike (Tr. 775). When the perceived need declined, the extra guards were effectively temporary employees whose temporary positions had run out. Randall's asserted "good faith" in hiring them does not constitute a business reason for transferring them into available production positions instead of reinstating strikers. We uphold the NLRB's conclusion on this point.

### E. *Shift Preference*

Under the collective-bargaining agreement in effect prior to the strike, employees at Randall were permitted to use their seniority to transfer to preferred shifts. Following the strike, Randall unilaterally discontinued the shift-preference practice. The NLRB determined that Randall had thereby discriminated against returning strikers because it treated them as new employees for purposes of department and shift assignments.[14] The Board relied on *NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 840–41 (5th Cir. 1978), *enforcing* 224 NLRB 393 (1976), in which the court held that the employer violated the Act by replacing its rotating-shift policy with a fixed-shift policy following a strike, so that returning strikers were permanently assigned to less desirable shifts.

---

13. The personnel manager testified: "I didn't actually rehire them. I just reinstated them back in and then they worked a couple more weeks or so and then they sold their house and left" (Tr. 763).

14. Cf. *Kansas City Power & Light Co. v. NLRB*, 641 F.2d 553 (8th Cir. 1981). This Court held that an employer violated the Act by requiring returning strikers who had been on probation prior to the strike to recommence their probationary periods as though they were new hires. "Such conduct, when considered from a common sense point of view, is bound to have a discouraging effect on present and future concerted activities . . . ." 641 F.2d at 559.

■ Randall argues that this case differs from *Moore Business Forms* because for Randall's employees, shift preference was not a policy, but simply a provision in the expired collective-bargaining agreement. Following expiration of the agreement, Randall did not change its policy, but rather ceased abiding by an agreement which was no longer in force. Randall asserts that under *Bio-Science Laboratories*, 209 NLRB 796 (1974), an employer is not required to follow provisions in a terminated collective-bargaining agreement.[15] *Bio-Science Laboratories* is inapplicable because it involved an attempt to apply a clause in an ongoing collective-bargaining agreement to a situation outside the scope of the agreement. Here the question is whether Randall's decision to remove a seniority privilege discriminated against striking employees. The fact that the privilege was written down in an agreement does not mean Randall could unilaterally eliminate it without a reason. Just as in *Moore Business Forms*, the alteration in shift assignment practices worked to the detriment of returning strikers. Randall's returning strikers were somewhat better off than those in *Moore Business Forms*, because they were not irrevocably locked into undesirable shifts, but nonetheless they were harmed through losing the right to use their seniority to move to pre-

ferred shifts upon request. The adverse effect on employee rights may only have been comparatively slight, but given Randall's failure to demonstrate a business purpose for its action,[16] the NLRB was justified in finding that Randall unlawfully ended its practice of shift preference.

## F. Insurance Coverage

The NLRB determined that Randall illegally treated returning strikers as new employees not only for purposes of shift assignment, but also for insurance purposes, because the strikers' insurance coverage did not resume until 60 days after they returned to work.

Randall defends its delay in reinstituting insurance coverage on the ground that the terms of the insurance policy were mandatory and left the company no other choice.[17]

■ The NLRB again cited *Moore Business Forms, supra*, 574 F.2d at 841, to support its conclusion on the insurance issue. In *Moore Business Forms*, the strikers' qualification for insurance coverage turned on the employer's decision whether to treat them as new employees or not. Here, by contrast, the employer's characterization was not the determining factor. The insurance contract specifically enumerated what

---

**15.** The striking employees in *Bio-Science Laboratories* contended they were entitled to be recalled in accordance with a provision in the collective-bargaining agreement governing recall from layoffs. Because of the strikers' seniority, application of the layoff provision would have entailed termination of permanent replacements, which the employer refused to do. The NLRB upheld the employer's position, pointing out that under *Mackay Radio*, an employer may not be forced to discharge permanent replacements.

**16.** Randall admits by implication that it offered no proof of a business purpose for eliminating shift preference. See Brief for Petitioner at 38. However, Randall argues that there was also no proof of harm to union activity, because no one offered evidence that employees in fact preferred one shift to another and because Randall reduced the number of shifts following the strike from three to two. Randall's argument is belied by the fact that the Union evinced enough concern about shift preference to include it in the expired bargaining agreement. Whether there were two or three shifts, it is

only logical that at least some employees would have a preference among them. See also testimony of Gary Stevens, Tr. 435, 442–43 (employee desired to move from night to day shift and did so when opportunity arose).

**17.** Randall's contract with Aetna Life & Casualty Company provided that any full-time permanent employee would be covered after the employee served a 60-day probationary period. However, coverage would halt and the employee would have to re-serve the probationary period if the employee ceased active work, defined as follows:

Ceasing active work will be considered to be immediate termination of employment, except that if you are absent from active work because of sickness, injury, temporary layoff, or leave of absence, or on account of being pensioned or retired, employment may be deemed to continue for the purposes of some of of the coverages up to the limits specified in the complete plan description . . . .

General Counsel's Exhibit 60.

categories were exceptions to the "ceasing active work" standard, and strikers were not on the list. In order to follow the General Counsel's suggestion and certify to Aetna that the strikers were eligible for coverage (See Respondent's Brief at 30), Randall would have had to violate its contract with Aetna. Because Randall did not have the right to alter the terms of its insurance contract unilaterally, it had a legitimate and non-discriminatory business reason for requiring returning strikers to wait 60 days before insurance coverage resumed. We decline to enforce the Board's order on this issue.

### G. The Stevens Incident

The NLRB found that Randall's personnel manager wrongfully solicited Gary Stevens to abandon the strike by asking him if he would like to sign the sign-up list. This was the only point on which the Board disagreed with the ALJ, and we find the Board's position to be unsupported by the evidence.

 Although the record shows that Stevens did not request to be approached about returning to work, the record also shows that the meeting was not initiated by Randall, and it came to an end as soon as Stevens indicated his intent to remain on strike. Because the meeting occurred at the behest of another employee, and because it was an isolated and non-coercive occurrence, we conclude that it did not constitute unlawful coercion under the Act. Accordingly, we deny enforcement of the portion of the Board's order relating to solicitation.

### III.

This case presents several issues which require careful weighing of the relative burdens on the rights of employer and employee within the framework established by the Supreme Court. On most of the issues, including the transfer of permanent replacements into special-rated jobs in preference to reinstating strikers, the recall of permanent replacements from alleged leaves of absence, the transfer of security guards into production positions, and the disallowance of shift preference, we conclude that the Board correctly identified and considered the competing interests, and accordingly we grant enforcement.

On the other issues, however, we hold that the NLRB has either misapplied the law or made factual findings unsupported by the record. We deny enforcement with respect to those issues, including Randall's temporary reinstatement of the Turnages, the interruption of returning strikers' insurance coverage, and the alleged solicitation of an employee to abandon the strike.

Enforcement granted in part, denied in part.