The **INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an Unincorporated Labor Organization, et al.,** Plaintiffs,

v.

**TRANS WORLD AIRLINES, INC., et al., Defendants.**

No. 86–6030–CV–SJ–6.

United States District Court,
W.D. Missouri,
St. Joseph Division.

May 26, 1988.

Order on Reconsideration Sept. 2, 1988.

William A. Jolley, Doyle T. Pryor, Scott A. Raisher, Jolley, Walsh, Hager & Gordon, Kansas City, Mo., for plaintiffs.

Murray Gartner, Proskauer, Rose, Goetz & Mendelson, Michael A. Katz, Trans World Airlines, Inc. Legal Dept., New York City, Paul E. Donnelly, Stinson, Mag & Fizzell, Kansas City, Mo., for defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT ON STRIKER RIGHTS TO FLIGHT SERVICE MANAGER POSITIONS

SACHS, District Judge.

Plaintiff union (IFFA) seeks partial summary judgment ruling that (1) post-strike changes in the qualifications of flight ser-

vice managers (FSMs) have been made without complying with the negotiation requirements of Section 6 of the Railway Labor Act, and (2) the conduct of defendant airline (TWA) in transferring strike replacements and other active employees to available flight service manager positions in preference to full term strikers awaiting reinstatement invidiously discriminated against the strikers because of their protected activity, in violation of the Railway Labor Act. While the scope of relief cannot be fully delineated at this time, there are no material facts in controversy that would preclude granting partial summary judgment in favor of IFFA. I agree with IFFA on both points presented.

Certain pending motions were argued to the court on April 16, 1988, including primarily the flight service manager controversy. The parties and the court have considered that major questions turn on the continuing existence of pertinent portions of the Red Book, the last collective bargaining agreement between the parties. This court has held that dues obligations and check-off provisions survived the termination of other provisions on which negotiations were carried to impasse in mediation; the rationale supports the continuing life of major portions of the contract. The Court of Appeals for the Eighth Circuit affirmed; on March 2, 1988, the Supreme Court also affirmed by an equally divided Court. *TWA v. IFFA*, — U.S. —, 108 S.Ct. 1101, 99 L.Ed.2d 150, affirming 809 F.2d 483 (this court's ruling is at 640 F.Supp. 1108). A petition for rehearing remains pending. Even if granted, for present purposes it will be assumed that the prior rulings on contract continuity remain sound. Since it is conceivable, however, that the Supreme Court will reconsider the question at the next Term, the present ruling will concentrate first on the "unfair labor practice" aspect of the controversy, irrespective of the minimum qualification standards for flight service managers under the contract; secondarily and in the alternative the court will consider the lawfulness of TWA's post-strike changes in service manager qualifications.[1]

A brief review of basic facts may be helpful, although the contentions of the parties really turn on widely divergent views of the applicable law. Flight service managers are flight attendants who perform regular duties of that position during flight and in addition have formal leadership responsibilities for the direction of other flight attendants who may be in the flight crew. Sur–Reply Affidavit of Diane Croll, dated May 12, 1988. They have some additional training and receive a pay incentive for their additional responsibility. Frankovich Affidavit, ¶ 6, and Exh. G, Doc. 141. Flight attendants without FSM duties are sometimes referred to simply as cabin attendants.

During the IFFA strike of March–May, 1986, TWA employed large numbers of previously inexperienced cabin attendants and also employed a considerable number of "crossover" flight attendants, some of whom had many years of experience. It is unclear how many inexperienced cabin attendants may have been assigned, in the strike emergency, to serve as lead flight attendants or FSMs. Many experienced FSMs were on strike. After the strike ended, with an unconditional offer by IFFA to return to work, FSM positions became open. This could occur by reason of inexperienced cabin attendants choosing or being required to take subordinate roles, voluntary or involuntary reassignment of some crossovers to subordinate roles, and (probably most significantly) by creation of more FSM positions through restructuring the work force. FSMs had not previously been used in narrow-bodied aircraft. Sur–Reply Affidavit, *supra*. TWA was not, however, engaged in a general expansion of its flight attendant work force after the strike ended and into April 1987. Approximately 200 full term strikers were rehired and that (together with using trainees as

---

1. The details of relief may conceivably be affected by the contract issue. This apparently cannot be known without discovery and fact development. In any event, broader relief is likely under the reinstatement rights theory than the contract theory, which would simply disqualify a limited number of persons assigned to serve as FSMs.

flight attendants) was the end of TWA's hiring or rehiring for 1986. Within the actively employed work force, however, ,there were numerous reassignments to FSM positions as they opened, particularly on October 1, 1986, and on April 1, 1987. Sur–Reply Affidavit, *supra.* Full-term strikers awaiting reinstatement were not offered these positions. The parties disagree on whether there were vacant positions that should have been offered to strikers. This is a legal question under the facts presented.

TWA does not contend that the filling of FSM positions from exclusively within the active employee list rather than from a list including strikers was based on individualized determination of better qualifications, greater experience or any business purpose other than (1) the lack of need .for more flight attendant employees as a group, and (2) the legal view that strikers were not entitled to an offer of reinstatement unless there were a need for additional flight attendants (not just FSM openings). IFFA contends that any lack of need for more flight attendants in general is not a protected business justification, and urges that reinstatement was required by law even if some cabin attendants might have been terminated as a result of the restructuring and the recall of strikers for FSM duty.

## I.

If this were a case brought under the National Labor Relations Act, the indications from the rather limited body of precedent available support IFFA. This court would consider itself bound by analogy to an Eighth Circuit precedent to hold that the position of flight service manager is a type of "special-rated job" requiring leadership skills and responsibilities not generally applicable to cabin attendant work, and that openings in such jobs must be offered in a nondiscriminatory manner to full-term strikers. Simply favoring active workers as a group for special work with additional pay incentives is an unfair labor practice. *Randall, Division of Textron, Inc. v. NLRB,* 687 F.2d 1240, 1243–7 (8th Cir.1982), *cert. den.,* 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). In that case Judge Arnold accepted the NLRB decision and rejected the employer's argument that there were no "vacancies" to be filled by strikers. Randall, like TWA, attempted to distinguish "between job openings created and filled by transfers within the existing active work force and job openings resulting from expansion of the work force." *Id.* at 1243. While some jobs may be treated as fungible and subject to purely internal reshuffling, the jobs there in question were considered by the court to be "special," noting that they were subject to posting and bidding under an expired collective bargaining agreement. In the present case, while TWA generalizes that all the employees here in question are flight attendants and contends the jobs are therefore fungible the undeniable showing is that the FSM positions are more entitled to special rating than most of the work in *Randall,* where "buffing, rolls, tool and die, maintenance and inspection" work was involved. As noted, special training is given to FSMs, they have special responsibilities for coordination and as leaders giving direction to others, they are paid more for their special work, and (except possibly in emergency situations such as strikes) they are not hired off the street and placed in charge of other flight attendants as their initial work assignment.

The *Randall* opinion states that neither "the employer's nor the employees' interests are clearly preeminent" and relies on the Labor Board for its policy decision favoring the high priority given to the right of strikers to reinstatement. *Id.* at 1246–7. A review of Labor Board rulings indicates a consistent pattern at least since 1975, favoring a duty to tender jobs to strikers when there are "special" job openings and rejecting a simpler bright-line concept that reinstatement offers must be made only when the pertinent work force from which the strikers are drawn is being enlarged or there have been departures from the employer's service which the employer is seeking to fill from outside. *See e.g., MCC Pacific Valves,* 244 NLRB 931 (1979), *enf. in part, den. in part,* 665 F.2d 1053 (9th Cir.1981); *Crossroads Chevrolet, Inc.,* 233

NLRB 728 (1977), *enf.*, 603 F.2d 225 (9th Cir.1979); *Wisconsin Packing Co.*, 231 NLRB 546 (1977). The most thorough opinion is in *MCC Pacific Valves,* where the Board, reversing the Administrative Law Judge, ruled that the fact the employer was "not adding additional people to its payroll" was not in itself a defense to a claim that a particular job opening must be offered to available strikers. 244 NLRB at 932.

An earlier decision, arguably contrary to this line of cases, is *Kennedy & Cohen of Georgia, Inc.*, 218 NLRB 1175 (1975), where it was held that the employer had a right to shift an employee from a supervisory position to a nonsupervisory sales position without offering the available sales position to a striker. *Id.* at 1176. The Administrative Law Judge in the *Randall* case considered the *Kennedy & Cohen* decision to have been overruled in *MCC Pacific Valves. Randall, Burkart/Randall, Division of Textron, Inc.,* 257 NLRB 1, 5 (1981). But the Eighth Circuit viewed *Kennedy & Cohen* as illustrating the rule that "employers may refuse to reinstate strikers to certain positions *if* they have legitimate business reasons" for such action. 687 F.2d at 1245 n. 8. While the "business reason" justifying a distinction is not articulated in *Kennedy & Cohen,* it may be permissibly presumed that a supervisory employee would have stronger job qualifications than a former striker who had been an ordinary salesman. One must agree with the *Randall* ALJ that the other possible reason (that the employer was contracting or at least not expanding its work force) would plainly apply in the later case of *MCC Pacific Valves* as well. It is not surprising that there has been no great articulation of Labor Board reasons in cases involving only a single employee or several employees.

TWA has had a full opportunity to respond to the pertinent cases, but has failed to do so, other than to attempt to distinguish the job differentials in *Randall* from those in the case at bar.[2] If there is a distinction, it seems that "special rated jobs" are more clearly involved here than in *Randall,* where the only difference noted was that they were separate for purposes of posting and bidding. Counsel's oral argument that tool and die work is more highly skilled than *Randall's* ordinary production work may possibly be so, but that is speculative, and the other special work is not clearly more uniquely demanding than the leadership role of an FSM.

The Eighth Circuit has confirmed this court's view that this Railway Labor Act case is governed, as to reinstatement rights after a strike, by principles developed under the National Labor Relations Act. *IFFA v. TWA,* 819 F.2d 839, 842 (8th Cir. 1987), *cert. granted on other issues.* It is arguable here that the balance struck by the Labor Board, after evaluating the rights of returning strikers, employers and new hires, should not be given the same deference shown to the Labor Board in *Randall,* but there are two good reasons to align the decision here with what I believe would likely be done under the National Labor Relations Act. First, in the interest of predictable legal consequences, employers and employees under both statutes should be able to rely on similar treatment, absent some good reason in the statutory language and history to produce different results. Neither side in this case urges me to depart from this practice in the present context. Second, the Labor Board decisions in *MCC Pacific Valve* and *Randall* have much to commend them, and little reason appears for moving out in a new direction. The one obvious factor that might favor TWA is the simplicity of its definition of a "vacancy" or opening in the

**2.** TWA does cite a later Labor Board case in which the ALJ used language suggesting that an internal *promotion* might preclude a reinstatement of a striker to the position filled by promotion. *Overhead Door,* 261 NLRB 657 (1982). The citations do not support the reference to promotions, which I believe misstates the prior and current law. The facts of that case do not support TWA, in that the new hires whose employment stood as a bar to reinstatement were initially hired for the work the strikers had been doing, and were only temporarily reassigned to other duty before being transferred back. It was also noted by the ALJ that, unlike the present situation, there was no wage differential between the jobs in question.

applicable work force. But that does not override the interest in consistency and fairness. The creation of a new definition of "vacancy," applicable only under the Railway Labor Act, would have a potential for causing new confusion and complexity in the law that would defeat the superficial simplicity of the rule advocated by TWA.

It is concluded that TWA violated its duty to full-term strikers seeking reinstatement when it filled vacancies in flight service manager positions after May 1986 without offering the strikers an opportunity for reinstatement to fill such vacancies.

## II.

■ For reasons set forth below, I also conclude that there were violations of the negotiation requirements of the Railway Labor Act when TWA unilaterally changed the prior service qualification of flight service managers from two years to one year. Exh. J., Doc. 141.

TWA asserts two positions justifying the changes: (1) it contends that a proposal, made before release from negotiations by the National Mediation Board, allowing it to abolish the service manager position, caused the position defined in Article 2(C) and Letter of Agreement II of the Red Book to drop out of the contract, thus allowing unlimited self-help by TWA on that subject during and after it was released in March 1986 to exercise unilateral action; and (2) it contends that proposals it made to IFFA during and after the strike should be treated as new contract proposals, subject to a demand for mediation, and that in the absence of such demand it had a right to implement the proposals.

The first contention has in effect already been ruled in the context of the check-off provision in Article 24(M) of the Red Book, which I believe TWA also contended disappeared because there were negotiations regarding termination of that obligation during a strike. It was the ruling of this court that the check-off provision continues in

effect, although it may be subject to a right to implement the proposed change at the times referred to. *TWA v. IFFA*, 640 F.Supp. 1108 (W.D.Mo.1986). While the affirmance does not refer specifically to that portion of Article 24, the Court of Appeals also approved enforcement of the check-off. *TWA v. IFFA*, 809 F.2d 483, 491–2 (8th Cir.1987). The rationale against inferring a self-destructive contract applies also to a self-destructive article. The article is subject to *amendment* pursuant to proposed changes. That is what the language of the contract states. Any other construction would not only conflict with the "amendable" nature of the contract the parties chose to sign (a description that has been solidly reconfirmed in the negotiating history I heard after the dues decision), but it would also allow a carrier to "hide its true intention to make certain changes so that the change is never negotiated and the NMB never has the opportunity to mediate the dispute." 809 F.2d at 492.

Even if TWA now has the right to abolish the position of flight service manager (Doc. 221, Exh. A), it has not elected to do so, but has elected to create many new FSM positions on narrow-bodied aircraft. TWA wants to retain the position but lower the eligibility qualifications in seniority terms (one instead of two years of prior service as a cabin attendant). This change is not fairly encompassed in the total abolition proposal[3] and can only be permitted if it has been subject to negotiation under Section 6 of the Railway Labor Act. 45 U.S.C. § 156.

IFFA correctly notes that the court has already expressed a preliminary view on the second question, that is, the legal effect of strike settlement proposals and other negotiations seeking to wrap up a dispute that has continued into the self-help period. In a memorandum and order on April 3, 1987, in Case No. 87–6014–CV–SJ–6, referred to as the "Ozark Integration" case, the parties were alerted to my view that

---

**3.** It is unclear what the objective of the proposal to eliminate FSMs was. In the absence of explanation, the saving of incentive pay would seem pertinent. The *increased* use of FSMs

adopted after the strike has the opposite effect, but presumably increases coordination and efficiency.

post-release discussions should not ordinarily be treated as a new set of Section 6 negotiations. That opinion states:

> While the parties continued to meet on occasion after they were released by the Board for a "cooling off period" and self-help, the negotiations that then occurred may be characterized as strike-settlement negotiations or impasse-breaking negotiations rather than Sec. 6 negotiations as contemplated by the contract between the parties ... TWA now urges the court that in March and the ensuing months of 1986 it was not only engaged in trying to avoid and settle a strike but also initiated a new series of negotiations for contract changes contemplated to take place on August 1, 1986. This is totally inconsistent with what it said and with the position taken by TWA until its recent acquiescence in court rulings ... TWA claimed the contract was dead, not amendable.

Legal briefing and argument in this case have not caused me to revise these conclusions. Until very recently, TWA has been fitfully trying to bring the curtain down on the last series of negotiations; it has neither announced nor is there any reason to believe it was intending to open a new round of Section 6 negotiations.

Neither side has offered authorities dealing with the issue under consideration. Apparently the problem was anticipated in one case, however, where self-help on a crew complement proposal was permitted, when the proposal had been "thoroughly discussed" in negotiation "and mediation proceedings." *Flight Eng. Int. Assn. v. Eastern Air Lines,* 208 F.Supp. 182, 191 (S.D.N.Y.1962), *aff'd. without opinion,* 307 F.2d 510, *cert. den.,* 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970 (1963). Judge Feinberg said, however, "This is not a situation in which the employer raised the crew complement issue for the first time after the union went on strike, where different considerations might be involved." 208

F.Supp. at 190. "Different considerations" are here involved.

TWA also raises an issue of waiver, which needs no discussion. On the record before me, it seems almost frivolous to contend that TWA intended to open a new series of Section 6 negotiations by raising new issues after the NMB release. Nothing that occurred supports bypassing the procedures required by the Railway Labor Act before instituting changes that have not gone through the mediation process or that the parties have tacitly consented to expedite to impasse without mediation. The one-year qualifier for flight service managers was not ripe for unilateral implementation by TWA when it first announced the unilateral change and then offered it as part of a strike-settlement proposal.

Partial summary judgment will be entered in favor of plaintiff IFFA and against defendant TWA declaring invalid (1) the one-year qualification provision for flight service managers and (2) the general practice of assigning cabin attendants to flight service manager positions after May 17, 1986, without offering such positions to full-term strikers.[4] SO ORDERED.

The parties are further ORDERED to confer and propose within thirty (30) days procedures necessary before a final order can be entered. A stipulation of additional facts may avoid doing things the hard way.

## ORDER ON RECONSIDERATION

TWA seeks a reconsideration of the partial summary judgment ruling of May 26, 1988, in favor of IFFA, relying on both the Sur–Reply Suggestions filed the same day and additional suggestions filed June 7, 1988, and thereafter.

### A.

■ The main contention in the May 26 filing is that neither the *Randall* nor *MCC Pacific Valves* litigation, previously cited, establishes a right of striker reinstatement to "special" jobs except when (1) the total

---

4. The court may not have enough information to rule that every one of such assignments has been invalid; fuller development of the facts is appropriate before a comprehensive or individ-ualized remedial order can be entered with full assurance that there are no material facts in dispute as to the remedy.

workforce from which the strikers are drawn is being expanded, or (2) there are departures from employment which require filling. As a practical matter, these alternatives do not exhaust the possibilities for a particular job opening or vacancy, which can just as readily occur in the context of restructuring of the workforce, where the employer adds personnel in a certain category of jobs.

Returning strikers are entitled to reinstatement "as new jobs are created" (*NLRB v. Transport Co. of Texas*, 438 F.2d 258, 264 (5th Cir.1971)), or when "a job for which the striker is qualified becomes available." *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967). Prior rulings in this litigation (particularly the settled issue as to trainees) establish a parallel between striker reinstatement rights under the Railway Labor Act and the National Labor Relations Act.

TWA's definition of a job opening has not been adopted by the Labor Board or a court, although it is not a novel suggestion. The ALJ in *Randall* quoted the employer contention there that there must be "vacancies created by the *departure* from the *plant* of permanent replacements" or an addition to the total pertinent workforce before reinstatement rights are triggered. 257 NLRB at 5 (emphasis in the opinion). No such limitation on striker rights appears in the notice to employees prescribed by the Board in *Randall:*

> We will not refuse to offer to qualified unreinstated strikers the opportunity to bid on special rated jobs in preference to strike replacements on the payroll.

257 NLRB at 1. This obviously covers openings in special-rated jobs created by employer action as well as by departures and by general enlargement of the workforce. The injunction in *Randall* and the remedial action ordered clearly go beyond the restriction advocated by the employer in that case and by TWA here. 257 NLRB at 12. The Eighth Circuit granted enforce-

ment, and I would feel compelled to follow that precedent even if I were to disagree, which is not the case.[1]

The definition of a job opening in *MCC Pacific Valves* also seems to follow the common sense broad usage adopted in *Randall*, although there is a footnote in the earlier case that "not every job opening is one that an unreinstated striker, though qualified, is *entitled* to fill." 244 NLRB at 934 n. 15. Conceivably this comment would allow an employer to argue that where it creates the opening it should be able to fill it, if possible, from within the active workforce, although such an argument would go well beyond the illustration given in the opinion, which deals with the comparative rights of full-term strikers. If an order of preference issue between strike replacements and unreinstated strikers was left open in *MCC Pacific Valves* it was clearly eliminated in the remedial order used in *Randall.*

There appears to be no compelling justification for the plant departure requirement, as advocated by TWA. Concededly the argument has some appeal if only because employer action would otherwise indirectly result in a frustration of some "permanent employment" expectations or hopes of persons employed during a strike. Employers do not usually offer "permanent employment" in the literal sense, however. They presumably need to satisfy new hires that they will not be "bumped" (that is, directly displaced) by returning strikers. This does not mean that either new hires or returning strikers are immunized from the adverse effect of economic changes or changes made by an employer in good faith to increase efficiency. *E.g.*, *NLRB v. Southern Florida Hotel*, 751 F.2d 1571, 1583 (11th Cir.1985) (waiter jobs lost when table service eliminated). The worst that can be said for the result in the present case is that some new hire cabin attendants may be indirectly crowded out by returning strikers who take openings in FSM positions; they are not being "bumped," as that term is defined. *Chambers v. Local*

---

1. The Eighth Circuit has previously emphasized the *Fleetwood* test of job availability and has rejected efforts to draw the line according to

how the job opening occurred. *Little Rock Automotive, Inc. v. NLRB*, 455 F.2d 163, 168 n. 7 (8th Cir.1972).

*Union No. 639, IBT,* 578 F.2d 375, 381 (D.C.Cir.1978).

If the employer here has offered more than a pledge against bumping, that would be a self-inflicted problem for resolution between TWA and the new hires. The *Mackay* rule simply protects against bumping—terminating new hires who have been promised that this will not be done to " 'create places' " for returning strikers.[2] *Cuneo v. NLRB,* 459 U.S. 1178, 1182, 103 S.Ct. 831, 833, 74 L.Ed.2d 1075 (1983) (Rehnquist, J., quoting *Mackay* in dissenting from denial of certiorari). TWA cannot rely on hypothetical overpromising to new hires to legitimate its interference with the rights of returning strikers.

While I hesitate to expound on labor law policy or sound personnel practices, and continue to believe that the problems illustrated by this case should result in legislation transferring the airlines from Railway Labor Act jurisdiction of a single judge to Labor Board jurisdiction, a candid statement of my concept of sound balancing of personnel rights may be appropriate for purposes of review. It does seem that most unbiased observers would suppose the balance of rights here favors employees with longevity over new hires with presumed greater loyalty to employer interests. Favoring "loyalty" may presuppose that the employer rather than the striking employees was somehow "right" in the economic strike. It also may presuppose that "loyal" new hires who entered the employer's service during the strike will be better employees than experienced flight attendants who came to the company's service in normal fashion; it may signify that an employer wants to punish or deter strikers. Absent such motives or presuppositions, which are inappropriate for a judge to adopt, the balance of personnel rights appears to favor career employees with proven records.[3]

While faithful adherence to *Mackay Radio* is an obligation of both the Labor Board and the courts, I believe that here, as in my earlier ruling in the trainee situation, caution should be used before increasing the protection given by that case to promises against post-strike displacement of new hires by returning strikers. This is not a situation like the crossover problem, where I believed (in a decision still in contention) that the sense and logic of *Mackay Radio* allowed an employer to offer protection to all those who worked during the strike. *See TWA v. IFFA,* — U.S. —, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) (granting certiorari on cross-over issue but not as to trainees).

### B.

 TWA's second contention that I deal with in this ruling is that my classification of flight service managers as special-rated employees was unsound. In determining whether FSMs have special-rated jobs TWA's brief asserts that pay differentials are "legally irrelevant." If that means that pay differences are not in themselves dispositive, that may be true. Judge Arnold as well as the *Randall* ALJ and the *Overhead Door* ALJ all referred, however, to such pay differentials or lack of differentials as factually pertinent or probative. 687 F.2d at 1241, 257 NLRB at 2–3, 261 NLRB 657. I agree with Judge Arnold's inference that where the production workers are "compensated at the same rate of pay" whereas special-rated positions are "more highly compensated" such pay differences are likely to be the *consequence* of the need for "additional skills" in the special-rated positions. 687 F.2d at 1241. The pay differentials have considerable probative significance in establishing that

2. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). It is true that the Court also spoke of "permanent" positions, but subsequent litigation confirms that the often-used wording is imprecise; plainly the Court was not referring to a presumed need to offer lifetime employment.

3. I do not believe this case involves any serious question of labor policy in the sense of trying to keep in balance the power of unions and employers. There is no reason to believe that employers as a class would be materially strengthened or weakened by validating or invalidating any promises to strike replacements that go beyond a simple pledge against bumping.

the jobs have essential differences.[4] IFFA's prior characterization of all bargaining unit positions as "fungible" is interesting, but does not alter the undisputed showing of significant job duty differences, as well as pay differentials.

TWA contends that the pay difference between FSMs and cabin attendants is not so substantial that persons feel financially compelled to accept the FSM positions. Many such promotions have apparently been rejected. That also tends to support IFFA. Apparently the FSM positions are so demanding or inconvenient that the pay differentials may not be enough to attract all or most persons who are offered the positions. In any event, a pay differential of $70–$80 per month, roughly 5% of the pay scale, as described by TWA at page 12 of its June 7 filing, is not insignificant, and in my view supports the conclusion that the position is a "special" job.[5] Nothing that has been filed causes me to find any material factual issue in the classification of FSMs as the holders of special rated jobs.

### C.

■ The June 7 filing does not require any elaborate discussion from me. The most challenging issue presented is the contention that if TWA had offered new FSM positions on the basis of seniority there is no assurance that unreinstated strikers would have been placed in those positions. TWA notes that some 200 full-term strikers recalled in May 1986 might have had first choice on some 40 FSM positions filled in October 1986. But the *Fleetwood Trailer* formulation of reinstatement rights seemingly overrides seniority and other job claims of active employees (at least until the strikers have been rescued from unemployment.) Even if it could be argued that *Fleetwood* simply requires nondiscriminatory offers which *include* unreinstated strikers, the questions

relate to remedy rather than rights and will be dealt with in a further appealable order after additional facts are established and additional legal contentions are developed.

In any event, given the showing by TWA that FSM positions are rather generally rejected by cabin attendants (including "90% of the rehired strikers"[6]), it is quite improbable that the 200 full-term strikers would have filled the new FSM positions. It is noted that TWA does not claim that the FSM positions created in October 1986 were in fact entirely filled by the senior reinstated strikers; therefore, it is very likely on the present showing that a nondiscriminatory offering of such positions to active employees and unreinstated strikers would have resulted in some of the places being filled by unreinstated strikers.

The motion for reconsideration and supporting materials have been studied, but I do not conclude there are material facts in controversy so as to preclude partial summary judgment. The request to withdraw the May 26 ruling will be DENIED. SO ORDERED.

Counsel shall jointly report to the court in writing on or before September 15, 1988, how they propose to present sufficient facts to permit a remedial order suitable for effectuating at least the initial stages of relief (as well as appellate rights). SO ORDERED.

---

4. If some of the *Randall* production workers did enjoy significantly higher pay scales (257 NLRB at 6, n. 17) it is conceivable that the decision unduly favored the employer. That aspect of the decision was not contested.

5. The amount in question apparently equals or exceeds typical cost-of-living adjustments. Proposals for a COLA deferral are often contested in a manner suggesting the parties consider the money to be of considerable significance.

6. TWA Suggestions of July 11, 1988, page 7.